No. 04-183

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 236

IN THE MATTER OF THE GUARDIANSHIP
AND CONSERVATORSHIP OF
ELIZABETH SAYLOR,

      an Alleged Incapacitated Person and Appellant.


APPEAL FROM:    District Court of the Ninth Judicial District,
                      In and for the County of Teton, Cause No. 99-DG-008
                      The Honorable Marc G. Buyske, Judge presiding.


COUNSEL OF RECORD:

      For Appellant:

            Shari M. Gianarelli, Attorney at Law, Conrad, Montana

      For Respondent:

            Gregory J. Hatley, James A. Donahue, Davis Hatley Haffeman & Tighe,
            Great Falls, Montana


                              Submitted on Briefs:  July 13, 2005

                                   Decided:   September 20, 2005

Filed:

_____
                             Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1      Elizabeth Saylor (Elizabeth) appeals from the Order and Judgment of the Ninth Judicial District Court, Teton County, dismissing her petition that Tim Saylor (Tim) be removed as conservator of Elizabeth's Montana property.

¶2      We affirm in part and remand for further proceedings consistent with this Opinion.

¶3      We address the following issue on appeal:

¶4      Did the District Court err by holding that Tim had not breached his fiduciary duties as conservator of Elizabeth's Montana property?

## FACTUAL AND PROCEDURAL BACKGROUND

¶5      By petition dated October 25, 1999, Tim, Elizabeth's stepson, asked the District Court to appoint a guardian and conservator for Elizabeth and, pending a hearing on the matter, to appoint a temporary guardian for her pursuant to § 72-5-317, MCA. The District Court appointed Tim Elizabeth's temporary guardian by Order issued on the same day. Shortly thereafter, Elizabeth and Deane Sadler (Deane), Elizabeth's brother, both filed written objections to Tim's appointment as temporary guardian.

¶6      The parties eventually entered into a settlement agreement, dated July 11, 2000, by which they agreed to the establishment of a guardianship and two limited conservatorships for Elizabeth. In particular, the parties agreed that Deane would serve as her limited guardian, with powers and duties as specified pursuant to § 72-5-321, MCA, and would also serve as the conservator of that portion of her assets which were located outside the State of

Montana. Tim, for his part, would serve as the conservator of her Montana property. The District Court approved the agreement by Order issued on the same day.

¶7 Conflict between the parties continued, however, now centering around what Elizabeth and Deane claimed to be Tim's failure to disclose certain financial documents related to his administration of Elizabeth's Montana estate. This conflict eventuated in the aforementioned "Petition for Removal of Conservator of the Montana Property of Elizabeth Saylor and Appointment of Successor Conservator and Complaint for Breach of Fiduciary Duty," which Elizabeth, her estate, and Deane[1] caused to be filed on July 5, 2002. Elizabeth and Deane alleged that Tim had failed to keep Elizabeth reasonably informed concerning his administration of Elizabeth's Montana estate in response to her reasonable request, in violation of §§ 72-34-124 and 125, MCA, fiduciary duties imposed upon him by § 72-5-423, MCA. They further alleged that Tim had breached his duties to administer the conservatorship solely in Elizabeth's interest, § 72-34-103, MCA; to avoid a conflict of interest in administering the conservatorship, § 72-34-105, MCA; to take reasonable steps under the circumstances to take and keep control of and to preserve the conservatorship property, § 72-34-107, MCA; to make the conservatorship property productive, § 72-34-108, MCA; and to properly administer the estate pursuant to § 72-34-114(1) and (2), MCA

---

[1] Deane's powers and duties as limited guardian were set forth in the Order that established his limited guardianship. *See* §§ 72-5-305(3) and 316(2), MCA. Among Deane's powers was "to assert and protect [Elizabeth's] rights . . . as necessary and with input from her."

3

(2001), all duties which § 72-5-423, MCA, likewise made incumbent upon him. Tim filed a response to the petition on July 23, 2002.

¶8 The District Court conducted a hearing on the petition on September 4, 2003, and dismissed it by Order dated November 12, 2003. This appeal followed.

¶9 We will introduce further facts as they become relevant to the discussion.

## STANDARD OF REVIEW

¶10 We review a trial court's determinations of law *de novo*. *Matter of Conservatorship of Kovatch* (1995), 271 Mont. 323, 326, 896 P.2d 444, 446. We typically review a trial court's findings of fact to determine whether those findings are clearly erroneous. *Kovatch,* 271 Mont. at 326, 896 P.2d at 446. A finding of fact is clearly erroneous if substantial evidence does not support it, if the district court misapprehended the effect of the evidence, or if, after reviewing the record, this Court is left with a firm conviction that a mistake has been made. *Eschenbacher v. Anderson,* 2001 MT 206, ¶ 22, 306 Mont. 321, ¶ 22, 34 P.3d 87, ¶ 22 (citing *Interstate Production Credit v. DeSaye* (1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287). However, we refined the clearly erroneous test when considering accountings submitted for conservatorships by holding that an accounting must be accurate, complete, and verifiable. *Matter of Estate of Clark* (1989), 237 Mont. 179, 184, 772 P.2d 299, 302.

## DISCUSSION

¶11 ***Did the District Court err by holding that Tim had not breached his fiduciary duties as conservator of Elizabeth's Montana property?***

4

¶12 We first address Tim's argument that Elizabeth has failed to assert proper grounds for removing him as conservator. Tim claims that she has not argued according to the standard for removal of a conservator, set forth at § 72-5-414, MCA, despite alleging breaches on his part of the aforementioned fiduciary duties. We disagree.

¶13 Section 72-5-414, MCA, reads, in relevant part: "The court may remove a conservator for *good cause*" (emphasis added). The statute itself does not define "good cause" for the specific purpose of conservator removal, nor have we had occasion to interpret the phrase expressly in our previous opinions.

¶14 Section 72-5-423, MCA, provides that, "[i]n the exercise of his powers, a conservator is to act as a fiduciary and shall observe the standards of care applicable to trustees." In *Redies v. Cosner*, 2002 MT 86, ¶ 37, 309 Mont. 315, ¶ 37, 48 P.3d 697, ¶ 37, we interpreted the phrase "standards of care applicable to trustees" in § 72-5-423, MCA, as meaning "duties of trustees" as set forth in Title 72, Chapter 34, Part 1, Montana Code Annotated. We also interpreted § 72-5-423, MCA, as imposing these duties on conservators. Conservators are thus under the same duties as trustees.

¶15 Section 72-33-618(2)(a) through (d), MCA, provides four specific grounds on which a court may remove a trustee. Section 72-33-618(2)(e), MCA, then provides in the alternative that the court may remove the trustee "for *other* good cause" (emphasis added). Thus, the legislature has defined "good cause," at least for the purposes of trustee removal, as including grounds (a) through (d) of § 72-33-618(2). Ground (a) is "if the trustee has

5

committed a breach of the trust[.]" Section 72-33-618(2)(a). Thus, "good cause" exists for a court to remove a trustee if it finds that the trustee has breached the trust.

¶16    "Except to the extent that the common law rules governing trusts are modified by statute, the common law as to trusts is the law of this state." Section 72-33-103, MCA. According to the Restatement (Second) of Trusts, an authoritative summary of the common law of trusts, "[a] breach of trust is a violation by the trustee of any duty which as trustee he owes to the beneficiary." Restatement (Second) of Trusts § 201 (1959). As noted above, these duties are set forth in Title 72, Chapter 34, Part 1, Montana Code Annotated. Thus, by breaching any of these duties, the trustee provides good cause for a court to remove him. *See* § 72-33-618(2)(a); Restatement (Second) of Trusts § 201 (1959).

¶17    Since conservators are under the same duties as trustees, and since the nature of their responsibilities is cognate with that of trustees, we conclude likewise that when a conservator breaches the duties, set forth by Title 72, Chapter 34, Part 1, Montana Code Annotated (Duties of Trustees), which § 72-5-423, MCA, imposes upon him, he gives a court good cause to remove him as conservator. Therefore, by alleging the various breaches of fiduciary duties, *see* ¶ 7 above, Elizabeth has alleged (though, as we hold, not established) good cause for Tim's removal as conservator.

¶18    Specifically, Elizabeth claims that Tim has breached his fiduciary duties by leasing certain real property, part of Elizabeth's Montana conservatorship assets, to his brother Pat Saylor (Pat) on terms which yield Elizabeth and her estate no financial benefit.

6

¶19    As the settlement agreement of July 11, 2000, established Deane's powers and duties as limited guardian, so also did it specify Tim's powers and duties as conservator of Elizabeth's Montana estate, among which powers was the power to lease the real property for agricultural purposes. This property, approximately 690 acres in Teton County, is known to the parties as "Glen Willow."

¶20    The lease which Tim entered into with Pat for Glen Willow provides in relevant part for a five-year lease term, with annual rent of $14,960.00, calculated by multiplying 220 head of cattle by $17.00 per animal-unit-month. Pat agreed to till and farm in a good and husband-like manner according to the best farming practices, and to furnish all equipment, seed, fertilizer, labor, and all the other costs of farming operations. In return, Pat was entitled to 100% of the crops, and to graze cattle on the land once the crop has been removed. Furthermore, the lease required Pat to maintain the property, pay all the taxes owing thereon, and keep insurance totalling no less than $500,000.00.

¶21    The rent owing was subject to two offsets. For use of the irrigation system which Pat had purchased and installed on the property, he was to receive $12,000.00 annually. Pat also was to be compensated in the amount of $3,000.00 per year for maintaining the residence in a condition suitable for Elizabeth's return. These two offsets together eliminated the rent which Pat nominally owed under the lease.

¶22    All parties agree that the irrigation system has not been used for several years, but that Pat nonetheless continues to receive the associated $12,000.00 annual credit towards his rental obligation. Thus, not only does the lease provide no material benefit to the estate

7

Elizabeth claims, but actually costs Elizabeth $12,000.00 each year that it is in effect. Tim admitted during testimony, furthermore, that the credit amounts were essentially fabricated *ex nihilo* in order to cancel Pat's monetary obligation.

¶23 Tim justifies the lease, in part, on the grounds that it memorialized the less formal arrangement for the upkeep and maintenance of Glen Willow which dated to 1977, when Pat began tending to the property for his father Fred Saylor (now deceased) and Elizabeth, Fred's wife. The District Court so found, and based its conclusions of law, in part, on this finding of fact.

¶24 Were this the only, or even the chief, basis upon which the District Court affirmed the lease, as Elizabeth claims it to be, our case law would constrain us to rule that the District Court had committed clear error. *Clark* stands, *inter alia*, for the principle that any arrangement between a present conservator and the protected person which subsisted prior to the imposition of the conservatorship does not necessarily determine the standard of care which the conservator owes, particularly if the continuance of such arrangement under the new regime would cause detriment to the estate which it is the conservator's duty to preserve and to make productive. *Clark*, 237 Mont. at 184-85, 772 P.2d at 302.

¶25 The District Court ruled, rather, that the lease relieved the estate of the expense of maintaining the property, and reflected the economic reality that Glen Willow was unprofitable as an agricultural endeavor. Supporting this determination is substantial testimony which tended to establish that leafy spurge, a controllable but virtually ineradicable noxious weed, has infested the property for at least the last forty years. The

8

District Court also heard substantial testimony to the effect that the gravelly nature of the soil renders the property difficult to irrigate, thus further reducing the land's potential crop yield.

¶26    Elizabeth's expert proferred a model lease which he had formulated after a survey of the property, which estimated its lease value to the estate at approximately $31,500.00 *per annum*.  Given the aforementioned testimony, we hold that the District Court did not err in finding that this model lease was unrealistic.

¶27    We do not, moreover, find in Pat's admission that he profits from his operations at Glen Willow the sinister import which Elizabeth does.  It was established during Pat's testimony that, though he cannot market the hay which he grows on Glen Willow due to the infestation of leafy spurge, he is able to sell more of the hay which he grows on his own property because he feeds his own cattle with the Glen Willow hay.  Leasing conservatorship real property is a prime method of deriving profit from it, and procuring maintenance for it, to the benefit of the estate.  As one noted commentator has observed:

> The power to lease is generally a necessary incident of the management of trust real property.  If the trustee is to hold real estate and has the usual duty to make the trust property productive, he can generally obtain profits from it only by leasing it to others, since he would not normally be permitted or expected to engage in business and obtain profit from the land directly.

George T. Bogert, Trusts § 139 (6th ed. 1987).  It would be difficult to attract lessees of trust, or, as here, conservatorship, property if the courts denied them the right to take profit from the property which they lease.  The fact that Glen Willow could not yield the estate in excess of what was reasonably necessary to recompense Pat is immaterial.

9

¶28    Thus, on the facts here, we conclude that the District Court did not err when it concluded that Tim exercised reasonable judgment regarding the lease arrangement, and did not breach his duty as conservator so as to require his removal.

¶29    As we noted in ¶ 22 above, however, Tim conceded during testimony that the sums with which the lease credited Pat as offsets to his rent obligation answered to no actual calculation. We simply cannot countenance such a course of action. Though we accept the District Court's essential determination, that this lease arrangement is the best that could be obtained for the estate, given the realities of the situation, and that Tim has not abused his position as conservator to Elizabeth's detriment, the formalities imposed on the conservatorship must be respected. The conservator must shun even the appearance of impropriety, an appearance which the procedure followed in the present case could not help but foster in Elizabeth's mind. We therefore remand to the District Court, with the instruction that it order an audit of the lease arrangement to be performed. This will enable the District Court to require the lease to be reformed in such a way that its figures will conform more closely to actualities. This will also subject the lease arrangement, the crux of this dispute, to the more searching scrutiny of the District Court, which will be free to revise its prior determinations should such scrutiny bring to light facts which do not appear in the record before us.

¶30    The Chief Justice, dissenting, questions our authority to order relief which was not requested of the District Court. We trace our authority to order an audit of the lease to two prime sources: law and equity.

¶31    Section 72-5-421(3), MCA, vests the District Court with all the powers over Elizabeth's estate and affairs, except the power to make a will, which she could exercise were she not a protected person. Section 72-5-421(3)(d), MCA, furthermore, provides that those powers include the power to "enter into contracts." A lease is a contract. *Riis v. Day* (1980), 188 Mont. 253, 258, 613 P.2d 696, 699; Black's Law Dictionary 898 (7th ed. 1999). As the District Court can make a lease on behalf of a protected person, so can it order that the lease be audited, as the greater power includes the lesser. In this case, the District Court has chosen to exercise its powers through the conservator, Tim. Section 72-5-421, MCA. As such, the court has the "exclusive jurisdiction to determine how the estate of the protected person which is subject to the laws of this state shall be managed, expended, or distributed to or for the use of the protected person or any of his dependents." Section 72-5-405(2), MCA. Under the facts of this case there is certainly no legal prohibition for the trial court ordering an audit--indeed, again, given the circumstances in this case, good management would require such an initial step toward requiring Tim to better account of his stewardship and better enable the court to supervise Tim's discharge of his fiduciary obligations.

¶32    Moreover, legal authority aside, equity favors this approach. By claiming that Tim had breached his fiduciary duties, Elizabeth invoked the District Court's equity jurisdiction, § 3-5-302(c), MCA, and, thus, our own on appeal, § 3-2-203, MCA. "A court of equity has jurisdiction over an alleged breach, abuse, or betrayal of a duty or obligation arising out of fiduciary . . . relations[.]"    30A C.J.S. *Equity* § 59 (1992) ("Fiduciary Rights and

11

Obligations"). This is a point which the Chief Justice fails to acknowledge, as her list of cases, none of which we decided as a court of equity, makes clear.

¶33 An equity court has the power to grant complete relief. As we held in *Blaine Bank of Montana v. Haugen* (1993), 260 Mont. 29, 35, 858 P.2d 14, 18: "Courts sitting in equity are empowered to determine all the questions involved in the case and to do complete justice; this includes the power to fashion an equitable result." We also stated in *Reickhoff v. Consolidated Gas Co.* (1950), 123 Mont. 555, 568-69, 217 P.2d 1076, 1083, that an equity court with jurisdiction over a controversy "may render final judgment in relation to all matters involved and growing out of that controversy."

¶34 The core of Elizabeth's argument was that Tim had granted to his brother Pat a lease which did not reflect the true value of her property, thereby abusing his conservatorship to Pat's benefit, and her detriment. As support for her argument, she cited Tim's admission that he made up some of the figures in the lease in order to negate Pat's rental obligation. This fact became a central question involved in the case, and reflected Tim's apparent failure to treat the formalities of the fiduciary relationship with the requisite seriousness. Although we affirm the District Court in its finding that Tim has not abused his office, nevertheless, as a court of equity, the trial court, and, in turn this Court, must fashion an equitable remedy--one which, here, is also fully authorized by statute--which resolves all matters involved in and growing out of the controversy between Elizabeth and Tim. We would be remiss in doing less.

12

¶35 As a practical matter, requiring an audit now with a view to better financial management in the future will head off further litigation. The District Court has continuing jurisdiction over this conservatorship. Section 72-5-405(2), MCA. The lease, with its imaginary figures, will naturally arouse suspicion and invite conflict each time Tim presents his annual accounting. We think it better to lance this boil than to let it fester.

¶36 That the Chief Justice would refuse to do so based on an overly formalistic approach to these sorts of cases is her prerogative. We simply do not agree with that approach.


/S/ JAMES C. NELSON

We Concur:

/S/ W. WILLIAM LEAPHART
/S/ PATRICIA O. COTTER
/S/ BRIAN MORRIS


Chief Justice Karla M. Gray, concurring in part and dissenting in part.


¶37 I agree entirely with the Court's opinion insofar as it addresses the issue before us, namely, whether the District Court erred by holding that Tim had not breached his fiduciary duties as conservator of Elizabeth's Montana property. I respectfully dissent, however, from the Court's remand.

¶38 In this case and most others, the appellant asks this Court to reverse the District Court. Similarly, in this case and most others, the respondent asks us to affirm the District Court.

14

Here, we properly affirm the District Court on the issue presented by the appellant. That should be the end of it.

¶39   Instead, the Court decides that it "simply cannot countenance" certain other matters it has noted in the record. As a result, it steps outside any relief requested by any party to this appeal and remands to the District Court with instructions that an audit of the lease arrangement be ordered so the District Court can "require the lease to be reformed in such a way that its figures will conform more closely to actualities" so as to

> subject the lease arrangement, the crux of this dispute, to the more searching scrutiny of the District Court, which will be free to revise its prior determinations should such scrutiny bring to light facts which do not appear in the record before us.

As is generally the case when this Court decides that it--rather than the parties or the District Court--is the appropriate "case manager" of the case, by stepping away from issues actually before us and making determinations neither sought nor briefed, I strenuously dissent. Moreover, the Court's action here is even more egregious than is sometimes the case. It not only remands to require the trial court to order an audit, it then clearly expects that court to revisit and revise its prior determinations should the "new" record suggest the propriety of such a course of action.

¶40   I need not discuss at length my reasoning in dissenting from the Court's *sua sponte* and, in my view, inappropriate actions here. I have written far too many concurring and dissenting opinions on this subject over the years to believe I can influence the Court to stop such practices. *See*, *e.g.*, *Arrowhead Sch. Dist. #75, Park Co. v. Klyap*, 2003 MT 294, ¶¶

15

81-83, 318 Mont. 103, ¶¶ 81-83, 79 P.3d 250, ¶¶ 81-83 (Gray, C.J., concurring and dissenting);

*Mallak v. State*, 2002 MT 35, ¶ 32, 308 Mont. 314, ¶ 32, 42 P.3d 794, ¶ 32 (Gray, C.J., dissenting); *Larson-Murphy v. Steiner*, 2000 MT 334, ¶ 140, 303 Mont. 96, ¶ 140, 15 P.3d 1205, ¶ 140 (Gray, J., dissenting); *Armstrong v. State*, 1999 MT 261, ¶ 77, 296 Mont. 361, ¶ 77, 989 P.2d 364, ¶ 77 (Gray, J., concurring); *State v. Worrall*, 1999 MT 55, ¶¶ 61-64, 67, 293 Mont. 439, ¶¶ 61-64, 67, 976 P.2d 968, ¶¶ 61-64, 67 (Gray, J., concurring and dissenting); *Craig v. Schell*, 1999 MT 40, ¶¶ 47, 49-55, 293 Mont. 323, ¶¶ 47, 49-55, 975 P.2d 820, ¶¶ 47, 49-55 (Gray, J., dissenting); *State v. Santos* (1995), 273 Mont. 125, 139, 902 P.2d 510, 518 (Gray, J., concurring).

¶41 Stated briefly, my view of such an action as the Court takes here is that it oversteps our proper role, at least verges on depriving a party of due process, and ignores the important role of the trial courts. Sadly, these actions also, in my view, decrease public trust and confidence in our Court and subject us to oft-stated and sometimes appropriate attacks from lawyers, Legislators and others. I simply cannot join in such an action here.

¶42 Have I ever participated in such inappropriate actions by this Court? I may have, although I cannot recall a specific instance. I do recall that, in *Worrall*, the author of the Court's opinion there (and here) and I exchanged views about the propriety of this Court raising and resolving issues *sua sponte*. There, I expressed again my concerns on this subject and observed his statement in concurrence in *State v. Zabawa* (1996), 279 Mont. 307, 318, 928 P.2d 151, 158, that "'[i]t is our obligation to decide the cases filed in this Court on

16

the basis of the issues and arguments raised by the parties.'" *Worrall*, ¶ 63 (Gray, J., concurring and dissenting). His response was "[t]hat concurrence still correctly sets forth my view." *Worrall*, ¶ 72 (Nelson, J., concurring). He went on, however, to discuss the justification for departing from that "general rule." *Worrall*, ¶¶ 72-82 (Nelson, J., concurring).

¶43 The problem with looking for exceptions to and justifications for departing from the general rule--that we are an appellate court which is obligated to decide the cases as they come to us--is that it is likely possible to locate such a justification in nearly any case. Indeed, it is not at all uncommon for us--in reviewing cases-- to think, "the lawyer had a winner here but didn't raise the right issues or arguments." Nor is it uncommon for us to read transcripts and locate additional issues which, in our view, should have been raised and argued to this Court.

¶44 It is our practice, however, and appropriately so, to decide the cases before us on the issues properly preserved in the trial courts, and raised and briefed on appeal. To the extent we do so only selectively, we leave ourselves open to the all too common accusation that we are being result-oriented. Under such circumstances, it is an unanswerable accusation.

¶45 The Court's response to my dissent is simply wrong. First, the Court states that I question this Court's "authority" to order relief not requested in the District Court. This is not true. I do not question whether this Court *can* exercise such authority. It can. As many are aware, this Court *can* do almost anything a majority of its members decide to do. Indeed, on some occasions, this approach has been called the "gorilla" Court approach. Authority is

17

not at issue here. This dissent (and others before it) questions the wisdom of the Court's *exercise* of its authority.

¶46 Next, the Court cites to various statutes which come nowhere near supporting its decision here to raise and decide an issue *sua sponte*. The statutes clearly grant *district courts* certain powers. I have no quarrel with the statutes; the statutes, however, do not vest those powers in *this* Court.

¶47 Moreover, I agree with the Court that there is "no legal prohibition for the trial court ordering an audit . . . ." The problem, of course, is that the *trial court* in this case did not order an audit. *This Court* orders the District Court to do so. Two entirely different concepts, indeed.

¶48 As to the Court's statement that "equity favors this approach," I could not disagree more. Section 3-2-203, MCA, invoked by the Court in this regard, merely states that the "appellate jurisdiction of the supreme court extends to all cases at law and in equity." The statute speaks to our *appellate* jurisdiction. It does not in any way authorize us to take on the role of a *trial* court in equity.

¶49 Similarly, while the Court correctly quotes from 30A C.J.S. *Equity* § 59, the quote has no application here. The C.J.S. *Equity* title has 156 sections. The very first, §1, is entitled Scope of Title. It states clearly and without equivocation that "[s]ubjects which are treated in other titles and *not* treated in this title include *appeals* from decrees or orders in equity[.]" 30A C.J.S. *Equity* § 1 (emphasis added). Thus, while the Court accuses me of failing to acknowledge some distinction between our proper appellate approach in equity

18

cases, I might suggest that the Court apparently just fails to understand the differences between a trial court's role and this Court's role.

¶50 Nor do *Haugen* or *Reickhoff* provide support for the Court's action here. No rational person would disagree with the Court's statement that an equity court has power to grant complete relief. We said so clearly in *Haugen*, 260 Mont. at 35, 858 P.2d at 18. However, *Haugen* involved our *appellate* review of a remedy fashioned by a trial court sitting in equity, as raised and argued by the parties to the appeal. We ultimately concluded that the trial court's remedy was not erroneous. *See Haugen*, 260 Mont. at 35, 858 P.2d at 18.

¶51 Likewise, the Court correctly quotes our statement from *Reickhoff* to the effect that an equity court may render final judgment with regard to all involved matters. Again, however, the Court fails to notice the context in which we made that statement, which was that both parties to a trial court decision in equity appealed to this Court. *Reickhoff*, 123 Mont. at 556, 217 P.2d at 1077. After addressing the parties' arguments, we affirmed one portion of the trial's decree and reversed another, remanding to the trial court only for the entry of judgment in favor of the prevailing party on the reversal. *Reickhoff*, 123 Mont. at 570, 217 P.2d at 1083-84.

¶52 The Court may, in its prerogative, perceive my distinction between a trial court and an appellate court, and my urging of restraint, as an "overly formalistic approach to these sorts of cases[.]" If so, so be it.

¶53    I concur in the Court's opinion on the legal issue before us. I vigorously dissent from its decision to go beyond the issue presented in order to reach what it believes to be a more "fair" result. I would affirm the District Court and end the opinion there.

/S/ KARLA M. GRAY

Justice Jim Rice joins in the foregoing concurring and dissenting Opinion of Chief Justice Karla M. Gray.

/S/ JIM RICE

Justice John Warner concurs and dissents.

¶54    I also agree with the Court's opinion insofar as it addresses the issues before us. I dissent to the order remanding this matter to the District Court for continued proceedings that the parties did not ask for, do not want, are costly, and are wasteful of the time and money of both the conservatorship estate and the District Court.

¶55    This appellate Court should know better than to unleash the dogs of war. This Court should have the judgment, and the humility, to know that its function is not to decide what people need, or what they want. They are perfectly capable of deciding such for themselves. I join the vigorous dissent of Chief Justice Gray for the reasons she has stated. It is indeed folly to force people to retain lawyers and accountants, and send them into a battle they do not want.

20

/S/ JOHN WARNER