DA 06-0586

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 144

IN RE:

THE CHARLES M. BAIR FAMILY TRUST,

      Petitioner.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DV 04-0261
Honorable G. Todd Baugh, Presiding Judge

COUNSEL OF RECORD:

    For Appellants:

        Roberta Anner-Hughes (argued), A. Clifford Edwards (argued);
Edwards, Frickle, Anner-Hughes, & Culver, Billings, Montana
(Friends of the Bair)

        Hon. Mike McGrath, Attorney General of Montana; Anthony
Johnstone (argued), Assistant Attorney General, Helena,
Montana (State)

    For Appellee:

        Carey Matovich (argued), Brooke B. Murphy; Matovich
& Keller, P.C., Billings, Montana (Board of Advisors)

        John G. Crist (argued), Benjamin J. Alke; Crist Law Firm,
Billings Montana (U.S. Bank)

    For Amici Curiae:

        Hon. Michael A. Cox, Attorney General of Michigan, Thomas L. Casey,
Solicitor General, Tracy A. Sonneborn, Assistant Attorney General,
Lansing, Michigan; Edward P. Nolde, Special Assistant Attorney
General, Bigfork, Montana (Michigan Attorney General, et al.)

Heard and Submitted:  October 31, 2007

Decided:   April 29, 2008

Filed:

_____

Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1    The State of Montana ("the State") and Jamie Doggett, Peter Marchi, Richard Moe, Lee Rostad, and Friends of the Bair Museum (collectively, "the Friends of the Bair") appeal from the District Court's decision, in which it determined that the Board of Advisors acted reasonably and did not breach its fiduciary duties to the Charles M. Bair Family Trust. The Trustee, U.S. Bank, N.A., cross-appeals from the District Court's decision to allow the Friends of the Bair to intervene in this action. We reverse.

¶2    We restate the issues as follows:

¶3    Did the District Court correctly determine that the Trust Agreement did not require the creation of the Museum?

¶4    Did the District Court correctly determine that the Board did not breach its fiduciary duties to the Trust?

¶5    Did the District Court correctly determine that the Friends of the Bair had standing to intervene in this action?

## BACKGROUND

¶6    On January 3, 1990, Alberta M. Bair executed a Trust Agreement with First Trust Company of Montana (succeeded in interest by U.S. Bank, N.A. ("the Trustee")). The Trust Agreement provided for the creation of the Charles M. Bair Family Trust ("the Trust"), a charitable trust that was to receive Alberta Bair's estate upon her death.

¶7    The Trust Agreement stated, in a section entitled PURPOSES OF THE TRUST, that the "purposes of the Trust are to devote and apply the property and the income to be derived therefrom exclusively for charitable, religious, scientific, literary, or educational

2

purposes . . . ." The section further stated that "no part of the Trust shall inure to the benefit" of any person, entity, or individual. The Trust Agreement prohibited the Trust from carrying on propaganda, attempting to influence legislation, or participating in, or intervening in any political campaign for any candidate for public office. The Trust Agreement required that the Trust be maintained in such a manner that it would maintain tax-exempt status under § 501(c)(3) of the Internal Revenue Code.

¶8 The Trust Agreement also created the Board of Advisors ("the Board") and granted the Board the power and authority to make charitable distributions from the Trust's income. The Trust Agreement directed that five members would constitute the Board: the president or the president's nominee of First Trust Company of Montana; the president or the president's nominee of First Bank (N.A.), Billings; the president or the president's nominee of Moulton, Bellingham, Longo & Mather, P.C.; and two members, designated by the Trustee, from the counties of Meagher, Wheatland, and Yellowstone, with not more than one member appointed from either Meagher or Wheatland counties.

¶9 The Trust Agreement also provided for the creation of a museum. In the section entitled, CREATION OF THE CHARLES M. BAIR FAMILY MUSEUM, the Trust Agreement stated that it had long been the "cherished aim and foremost desire" of Alberta Bair to establish a museum that would "perpetuate the historic and artistic significance of the Charles M. Bair Ranch and the people associated with it." The Trust Agreement then stated:

> It is therefore [Alberta Bair's] will that the Board of Advisors devote [her] entire residence, together with all personal property of lasting historical and artistic value located therein, and together with surrounding grounds and

3

outbuildings necessary for such purpose, to the establishment of a museum to be named the Charles M. Bair Family Museum [("the Museum")] which shall be open for the educational benefit of the general public.

The Trust Agreement granted the Board the option to establish a separate charitable entity to operate the Museum and directed the Board to use "whatever principal and income" of the Trust "necessary to establish, improve and maintain the museum . . . ."

¶10 The Trust Agreement authorized the Board, "[i]n fulfilling its purposes of opening the museum to the general public for scholarly, educational and historical purposes," to acquire additional land, to "erect and/or maintain existing structures suitable" to a museum's operation, and to hire employees to operate the museum. The Trust Agreement instructed that the Museum had "first priority on income" distributed by the Board.

¶11 The Trust Agreement empowered the Board to "sell, transfer, relocate the museum, or otherwise dispose of all of the property then held as a part of [the Museum]" in two circumstances: (1) following the fifth anniversary of Alberta Bair's death, if the Board, "acting in its sole judgment and discretion," determined that the Museum no longer served its purposes such that it was "inadvisable to continue the museum for public and educational purposes"; and (2) if a "fire or other cause" so damaged or destroyed the Bair Family residence or its contents that the Board determined, in its sole judgment, that "it would be impossible, impractical or inadvisable to repair and restore the same" and for the Museum to carry out its original objectives.

¶12 The Trust Agreement assigned a primarily administrative role to the Trustee relating to the Trust's charitable distributions and the Museum. The Trust Agreement

4

granted the Trustee no power to approve or deny specific charitable requests and no decision-making power to determine whether the Museum should be closed or remain open.

¶13 Following Alberta Bair's death in 1993, the Board held its initial meeting at Alberta Bair's residence in Martinsdale, Montana. The Board reviewed the Trust Agreement and determined that it indicated a clear directive to create the Museum. Soon after, the Board issued a press release introducing the Board members and informing the public that the Board had been "charged with the responsibility of fulfilling 'the cherished aim and foremost desire of Marguerite and Alberta Bair to establish a museum which would perpetuate the historic and artistic significance of the Charles M. Bair Ranch . . . .'" The release also informed the public that, though the Trust Agreement "designates this priority [the Museum], other charitable requests will be considered" by the Board. In 1993, the Trust was valued at approximately $23,500,000.

¶14 At the initial meeting, David Leavengood, a restoration architect, provided the Board his assessment regarding the conversion of the Bair Family residence to a museum. The Leavengood Study addressed the issues fundamental to "creating an environment of acceptable standards for a modern museum . . . ." Leavengood stated that he had no doubts that the Bair Ranch had the "potential of being a world-class institution . . . . The family history, the collection and the building are all in place; the museum's future is bright and needs only careful guidance." His study documented the ranch's existing condition, recommended changes to "correct hazardous aspects[,]" and offered suggestions to transform the residence into a museum. Leavengood's suggestions

5

included installing a fire-sprinkler system, installing a new air-handling system to maintain stable temperatures and humidity levels, installing a sophisticated security system, and constructing an additional building for the Museum. Leavengood estimated the total preplanning costs for converting the Bair Family residence to a Museum to be between $1,935,375 and $2,517,320.

¶15 By March 30, 1994, the Board had also established a working relationship with CTA Architects Engineers ("CTA"). CTA generated a Master Plan that identified many of the same concerns as Leavengood's study. CTA's recommendations included installing a fire-sprinkler system, installing electrical and plumbing upgrades, constructing a climate-controlled enclosure with precise temperature and humidity controls for the archives, constructing an additional building for a visitor center, and general repainting and landscaping. CTA's preliminary cost analysis estimated the costs at $1,023,200.

¶16 In November 1994, CTA submitted a second estimate entitled, "Revised Project Cost Analysis – Minimum Operation." The revised proposal focused on (1) making critical improvements or repair to the house; (2) installing high priority safety and security items, such as a fire sprinkler, new electrical wiring, fire-protection water storage, and storm windows; (3) simplifying the barn renovation by using existing materials and forgoing a sprinkler system and loft improvements, including the air-handling system with temperature and humidity controls; (4) simplifying the site development; and (5) providing staff support housing consisting of a renovated mobile

home for the Caretaker and a new mobile home for the Curator. CTA estimated the costs of its Minimum Operation proposal at $521,000.

¶17 Following additional discussions, CTA further amended its Minimum Operation's estimate. CTA's reworked proposal eliminated the fire sprinkler system and the related fire-protection expenses and modified the staff housing. Through these reductions, CTA reduced the estimated costs to $328,000, approximately one-third the amount of its original estimate. The Board unanimously approved CTA's proposal. The Board ultimately spent approximately $600,000 on converting the home into a museum, including $25,000 to "spruce up" the Museum before its grand opening. CTA continued to perform maintenance and repairs for the Museum through 1999.

¶18 The Board consulted with the C. M. Russell Museum ("CMR") throughout the process of converting the Bair Family residence into a Museum. CMR assisted the Board in identifying issues related to the preparation, opening, and operation of the Museum, and CMR helped the Board develop an initial operating budget for the Museum. In 1995, the Board contracted with CMR to operate the Museum on a year-to-year basis. CMR's services included those "that are generally performed by an organization that operates a museum for the educational benefit of the general public." CMR served as the Museum's operator during the years that the Museum was operational.

¶19 The Museum opened to the public on May 2, 1996, and more than 14,000 visitors toured the Museum in its first season. The Museum's collection included unique Native American art of the highest quality; European furniture, silver, and decorations; photographs by Edward S. Curtis; and paintings and watercolors by Charles M. Russell,

7

Joseph Henry Sharp, and J. K. Ralston. Though the Museum's attendance in 1997 and 1998 exceeded CMR's expectations, the Museum's attendance successively declined in the years following the Museum's opening. In 2002, the Museum's final year of operation, 4,357 visitors toured the Museum.

¶20 Following the 2002 season, CMR submitted an annual report to the Board that advised the Board of issues that CMR considered critical to the Museum's future success. CMR recommended that the Board increase the Trust's contribution to the Museum and that the Board project expenses and revenues for three to five years. CMR recognized that the Board would eventually implement a separate Board of Trustees for the Museum, and it recommended that the new board focus on meeting the Museum's short-term needs and working to ensure the Museum's long-term financial health. CMR also recommended that the Board hire a professional museum administrator to give year-round attention to "fund raising, management, collections, education and interpretation and marketing."

¶21 Based on CMR's report, the Board had "serious concerns" as to whether the Museum was meeting its purposes. The Board's 2005 Memorandum of Decision ("Memorandum"), in which the Board set forth its reasons for closing the Museum, stated that, after reviewing CMR's report, it "was readily apparent that much more time, money, and resources were required by the Museum while the likelihood of any return, in terms of greater attendance or educational possibilities, was not good." In November 2002, the Board unanimously voted that the Museum "not be reopened for the year 2003 and

8

beyond." The Board chairman described the Board's action as a temporary suspension of the Museum's operation in response to an inquiry from the Attorney General's office.

¶22 Following the decision to close the Museum temporarily, the Board decided to hire a consultant to review the feasibility of the Museum's continued operations and to provide the Board with recommendations. In an email to his fellow Board members, the Board chairman expressed his view, shared by the Trust Administrator, regarding the Museum's repairs and maintenance:

> Given – The museum was never really made 'museum ready' in 1995 when it opened. A lot of work was done but many issues linger in terms of compliance with government regs, good curatorship, etc. The house is not disability friendly. It does not have climate control for good preservation of artifacts. It is not user friendly in terms of taking large groups through. It has inadequate bathrooms.

> Given – The museum has band-aided itself along through it's [sic] 8 years of operations as it dealt with all these inconsistencies. These inconsistencies contribute to cost, efficiency and other factors key to successful operation.

> Given – We are headed off on the same track again in asking CMR to get bids to fix leaky roof, replace bay windows and rebuild rails on second floor balconies.

The Board eventually hired CTA to assess the Museum's current condition, to prioritize deferred maintenance tasks, and to provide cost estimates. In addition to CTA, the Board hired a consultant, Peter Hassrick, to review the Museum's continued feasibility and to provide the Board with options to preserve the Bair family legacy. Gene Kolstad, a CTA architect, also presented the Board with options for the Museum's future. The Museum remained closed while Hassrick and CTA, working together with CMR, conducted their studies.

9

¶23 On February 29, 2004, the Friends of the Bair sent the Trustee a letter threatening legal action if the Trustee did not reopen the Museum. The Trustee then filed a petition with the District Court in which the Trustee asked the court to determine (1) whether the Board had the power to direct the Trustee to suspend the Museum's operation; (2) whether the Board had the power to determine that the Museum had ceased to serve its purposes under the Trust Agreement to the extent that it was "inadvisable to continue the Museum for public and educational purposes"; and (3) whether the Board had the power to direct the Trustee to sell, transfer, or relocate the museum if the Board determined that the Museum had ceased to serve its purposes.

¶24 The Friends of the Bair filed a motion to intervene in the action and claimed that the individual members comprising the Friends of the Bair possessed a statutory right to enforce the terms of the charitable trust as "special interest" beneficiaries under § 72-33-503, MCA. The Trustee opposed the motion and asserted that the Friends of the Bair lacked standing to intervene. The Trustee further argued that the Montana Attorney General bears the responsibility to safeguard and to advocate for the general public's interest. The District Court determined that the individual members had a "special interest" and allowed the Friends of the Bair to intervene. Subsequently, the District Court granted the Attorney General's and the Board's motions to intervene in the action.

¶25 In the midst of the proceedings, the Board announced its decision to permanently close the Museum. The Board set forth its reasoning in a Memorandum of Decision. The Board stated that the Museum had "ceased to meet the scholarly, educational and historical purposes for which [the Museum] was established . . . ." As support for its

10

decision, the Board cited the 1993 Leavengood Study, the 2002 CMR report, and a Sotheby's appraisal of the Museum's collection as documents that the Board felt "raised serious concerns regarding the feasibility of continuing to operate" the Museum. The Board specifically noted that the Leavengood Study had highlighted concerns such as the location of the Museum and the "extended response time from the local volunteer fire department and/or law enforcement[,]" the lack of a proper HVAC system to handle temperature fluctuations and relative humidity concerns, and the recommendation that an interior and exterior closed-circuit television monitoring system be installed to address security concerns. In light of these "physical limitations," the Board considered "alarming" the Museum collection's increase in value; an appraisal by Sotheby's of New York indicated that the collection had increased nearly $3,000,000 in value between 1996 and 2004. At the time the Board decided to permanently close the Museum, the Trust was valued at approximately $55,000,000.

¶26 Following the Board's decision to close the Museum, the State moved for summary judgment and requested that the District Court determine that the Board, acting through the Trustee, had breached its fiduciary duties and its duties under the Trust. In a ruling denying the State's motion for summary judgment, the District Court determined that the Trust Agreement authorized the Museum's creation in a precatory clause, and thus, the Museum's creation was not required. Nonetheless, the District Court determined that, because the Board had created the Museum, the Board was obligated to follow the Trust Agreement's directions when determining the circumstances under which the Board could close the Museum. The District Court denied the State's motion,

11

reasoning that, "abuse of discretion, on the one hand, and reasoned forethought, on the other, are mixed questions of law and fact that dictate a decision on the law and facts at trial and not by summary judgment."

¶27 After conducting a four-day trial, the District Court concluded that the Board had "aptly managed and overseen" its duties, that the Board had "successfully and appropriately managed their part" of the Trust's financial affairs, and that the Board had "managed, improved, maintained and repaired the museum." The District Court further concluded that the Board did not act arbitrarily and capriciously and that the Board had acted with "considered forethought and reasoning." The District Court entered judgment in favor of the Trustee and the Board. The State and the Friends of the Bair appeal the District Court's judgment, and the Trustee appeals the District Court's decision allowing the Friends of the Bair to intervene.

**STANDARD OF REVIEW**

¶28 We review a district court's findings of fact to determine whether they are clearly erroneous. *Slauson v. Bertelsen Family Trust*, 2006 MT 314, ¶ 10, 335 Mont. 43, ¶ 10, 151 P.3d 866, ¶ 10. We review for correctness a district court's conclusions of law. *Slauson*, ¶ 10.

**DISCUSSION**

¶29 **I Did the District Court correctly determine that the Trust Agreement did not require the creation of the Museum?**

12

¶30 The State asserts that the District Court mistakenly interpreted the Trust Agreement when it concluded that the creation of the Museum was authorized in a precatory clause and thus viewed the Board's decision to create the Museum as discretionary. The State argues that the terms of the Trust Agreement – describing the Museum as Alberta Bair's "cherished aim and foremost desire" and expressing her "'*will* that the [Board] devote' her residence, its contents, and its grounds to '[the Museum] which *shall be open*'" for the general public's educational benefit – contradict the District Court's determination. The State further argues that this language expresses a trust's primary purpose. According to the State, the Board's and the District Court's "initial failure" to appreciate the Trust Agreement's plain meaning underlies their neglect of the Museum.

¶31 The Board responds that the Museum was never the "driving force" behind the Trust. The Board maintains that the Trust Agreement unambiguously expresses that the Trust's purpose was to devote the Trust's property and income to general philanthropy. Further, the Board contrasts the Trust Agreement's language regarding the duration of the Trust and the duration of the Museum: the Board argues that the Trust was to endure forever, while the Museum was limited to the five years following Alberta Bair's death if the Board determined that the Museum was failing to meet its purposes. Similarly, the Trustee asserts that the Museum was not the central purpose of the Trust because Alberta Bair did not refer to the Museum in the PURPOSES OF THE TRUST section. The Trustee states that reference to the Museum's creation is "noticeably absent" from the Trust Agreement's expressly stated purposes, and the Trustee asserts that if

13

Alberta Bair "had intended the Museum to be the central purpose, she could have said so." The Trustee maintains that the Trust's purpose was not to create and fund a museum, and the State's contrary arguments reflect a "fundamental misreading of the Trust Agreement."

¶32 The District Court's interpretation of the Trust Agreement presents a question of law, which we review for correctness. *In re Marriage of Holloway*, 2000 MT 104, ¶ 5, 299 Mont. 291, ¶ 5, 999 P.2d 980, ¶ 5. The trustor's intent controls our interpretation of a trust agreement, and we attempt to discern the trustor's intent from the language of the entire trust agreement, rather than from a particular word or phrase. *Matter of Estate of Bolinger*, 284 Mont. 114, 120, 943 P.2d 981, 985 (1997); *In re Estate of Snyder*, 2000 MT 113, ¶ 10, 299 Mont. 421, ¶ 10, 2 P.3d 238, ¶ 10. We seek to interpret a trust agreement's language such that every expression gains "some effect," rather than an interpretation that renders inoperative any of the expressions. *In re Estate of Snyder*, ¶ 10 (citations omitted). When interpreting an instrument, we emphasize substance over form, and we construe the instrument's words in "their ordinary and grammatical sense[,]" absent a clear opposite intention. *In re Estate of Snyder*, ¶ 10 (citations omitted). Laws governing the construction and operation of wills also apply to trusts. Section 72-33-106, MCA.

¶33 The language Alberta Bair used in § 6.2(a) of the Trust Agreement, entitled PURPOSES OF THE TRUST, clearly manifests her intention that the Charles M. Bair Family Trust exist as a charitable trust. The Trust Agreement provides that the "purposes of the Trust are to devote and apply the property and the income to be derived therefrom

14

exclusively for charitable, religious, scientific, literary, or educational purposes . . . ." The section further states that "no part of the Trust shall inure" to the benefit of any private person, entity, or individual. The Trust Agreement prohibits the Trust from carrying on propaganda, attempting to influence legislation, or participating in any campaign activity for or against candidates for public office. In summary, the Trust Agreement's language parallels Internal Revenue Code § 501(c)(3), which defines tax-exempt entities. Section 6.2(a) further provides that "the Trust shall not conduct or carry on any activities not permitted to be conducted or carried on by an organization exempt under [I.R.C. § 501(c)(3)] and its regulations as they now exist or as they may hereafter be amended . . . ."

¶34 Section 6.2(b) of the Trust Agreement, entitled USE OF TRUST FUNDS, directs the Board "to distribute from time to time exclusively for charitable, religious, scientific, literary or educational purposes, or any of them, each year, such amount of the income only of the Trust as [the Board] in its discretion may order, appoint or direct." The Trust Agreement instructs that the Board must make the distributions in such a manner that the Trust will incur no tax on the undistributed income. Based on these sections of the Trust Agreement, we conclude that Alberta Bair intended to create a charitable trust with general philanthropy as a Trust purpose.

¶35 Though we conclude that general philanthropy was a purpose of the Trust, we cannot agree with the District Court's conclusion that the Trust Agreement granted the Board discretion to decide whether to establish the Museum. Section 6.2(e) of the Trust, entitled CREATION OF THE CHARLES M. BAIR FAMILY MUSEUM, instructs:

In carrying out the charitable purposes of the Trust as aforesaid and without intending to limit the generality thereof, it has long been the cherished aim and foremost desire of Grantor's sister and Grantor [Alberta Bair] to establish a museum which would perpetuate the historic and artistic significance of the Charles M. Bair Ranch and the people associated with it. It is therefore Grantor's will that the Board of Advisors devote Grantor's entire residence, together with all personal property of lasting historical and artistic value located therein, and together with surrounding grounds and outbuildings necessary for such purpose, to the establishment of a museum to be named the Charles M. Bair Family Museum which shall be open for the educational benefit of the general public. . . . The Board of Advisors is directed to use whatever principal and income of the Charles M. Bair Family Trust that is necessary to establish, improve and maintain the museum, and shall have full discretion and authority to administer and manage the same.

The District Court dismissed this language as precatory and concluded that the Trust Agreement did not require the establishment of the Museum. Precatory language expresses merely a wish or a recommendation and generally creates, at most, an ethical obligation, rather than a legal obligation. *Matter of Estate of Bolinger*, 284 Mont. at 122-23, 943 P.2d at 986 (citing George T. Bogert, *Trusts* § 19, 41 (6th ed., West 1987)). The primary inquiry when construing an expression is whether the testator intended only "to advise or influence" the devisee's discretion, or to "control or direct the disposition intended." *Matter of Estate of Bolinger*, 284 Mont. at 123, 943 P.2d at 986 (citing Bogert, *Trusts* § 19 at 42). In *Matter of Estate of Bolinger*, we determined that the will's language at issue failed to create an express trust because the words imposed no "clear directive or obligation" on the purported trustee. 284 Mont. at 124, 943 P.2d at 987. Further, the language provided the purported trustee no direction or guidance to implement the trustor's intent and granted the purported trustee "complete discretion" as to the estate's use. *Matter of Estate of Bolinger*, 284 Mont. at 124-25, 943 P.2d at 987.

16

¶36 The District Court's determination that the Trust Agreement imposed no legal obligation on the Board to create the Museum would find some support if Alberta Bair only described her desire to establish the Museum as her "cherished aim and foremost desire." Section § 6.2(e) however, does more than advise or attempt to influence the Board to create Alberta Bair's Museum, *Matter of Estate of Bolinger*, 284 Mont. at 123, 943 P.2d 986; rather, her Trust Agreement provides a clear directive to the Board to create the Museum and provides the Board with direction and guidance on how to proceed. The Trust Agreement sets forth the location of the Museum, the real and personal property that Alberta Bair wanted the Board to devote to the Museum, the name of the Museum, the purpose of the Museum, and the means to fund the Museum with "whatever principal and income" necessary from the Trust.

¶37 Moreover, although the Trust Agreement grants the Board discretion to administer and manage the Museum, the Trust Agreement grants the Board no discretion to decide whether to establish the Museum. On the contrary, the Trust Agreement *directs* the Board to "use whatever principal and income of the [Trust] that is necessary to establish, improve and maintain the museum . . . ." Additional language in § 6.2(e) further demonstrates the level of direction and control Alberta Bair maintained regarding the Trust's assets and the relationship between the Museum and general philanthropy: the Museum "created herein shall have first priority on income to be distributed from the Trust by the Board of Advisors." The Trust Agreement also grants the Board authority to "acquire required additional land, erect and/or maintain existing structures suitable to the

operation of a museum, and [to] employ such person or persons to operate the museum in accord with Grantor's wishes" as interpreted by the Board.

¶38    The specificity contained within the Trust Agreement's language expresses Alberta Bair's intent to "control or direct" the establishment of the Museum, rather than to merely "advise or influence" the Board. *Matter of Estate of Bolinger*, 284 Mont. at 123, 943 P.2d at 986 (citing Bogert, *Trusts* § 19 at 42).  We conclude that the District Court erroneously determined that the Trust Agreement did not require the establishment of the Museum; on the contrary, the Trust Agreement's language mandates the creation of the Museum.

¶39    Further, while we agree with the Board and the Trustee that general philanthropy was a purpose of Alberta Bair's Trust, we cannot agree that general philanthropy constituted the primary purpose of the Trust.  On the contrary, we conclude from the plain language of the Trust Agreement that the establishment of the Museum constituted the Trust's primary purpose.  As discussed in ¶ 38, Alberta Bair issued a clear directive to the Board to establish the Museum; the Museum's creation was not left to the Board's discretion.  Further, the Trust Agreement authorizes the Board to invade the principal of the Trust only on behalf of the Museum.  Though the Trust Agreement directs the Board to distribute "income only" for general philanthropic purposes, the Trust Agreement directs the Board "to use *whatever principal and income* of the [Trust] that is necessary to establish, improve and maintain the museum . . . ."  (Emphasis added.)

¶40    Additionally, the Trust Agreement's plain language accords the Museum priority over general philanthropy; the Trust Agreement specifically states that the Museum

18

"shall have first priority on income" distributed by the Board. Finally, other than the section concerning the Board's self-administration, the Trust Agreement's only specific directions to the Board concern the Museum's creation. In contrast, the general philanthropic purposes are left to the Board's discretion, provided that the Board does not run afoul of the tax code. While Alberta Bair clearly intended to create a charitable trust with general philanthropic purposes, we conclude that the creation of the Museum was the primary purpose of the Trust.

¶41 The Board argues that the Museum's potentially limited five-year duration stands in "stark contrast" to the Trust's perpetual duration, and it asserts that these different durations support the Board's position that general philanthropy, rather than the Museum, constituted the Trust's primary purpose. We disagree with the Board's reading of the Trust Agreement. Unless the main dwelling or its contents suffers significant damage or destruction from "fire or other cause[,]" the Trust Agreement specifically prohibits the Board from selling, transferring, relocating, or otherwise disposing of the Museum and its property for the five-year period following Alberta Bair's death. After the five-year period, the Trust Agreement further requires that the Board first determine that the Museum "has ceased to serve" its purposes to the extent that it is "inadvisable to continue the museum for public and educational purposes . . . ." Only after these conditions have been satisfied could the Board sell, transfer, relocate, or otherwise dispose of the Museum.

¶42 In contrast, the Board could terminate the Trust at any time. The Trust's duration was not "forever" as the Board maintains; rather, the Trust Agreement provides that the

19

"Trust shall continue forever *unless* the Trustee and four members of the Board of Advisors decide to terminate it and distribute all of the principal and income, which action may be taken by the Board of Advisors *in its discretion at any time*." (Emphases added.) The Board could terminate the Trust at any time, including, presumably, at the Board's initial meeting. Thus, the Board finds no support in the different durations assigned to the Museum and to the Trust. On the contrary, the different durations weigh against the Board's interpretation of the Trust Agreement. Further, the Trust Agreement indicates that Alberta Bair contemplated that the Museum would exist independently from the Trust, and she granted the Board the option to establish and fund a separate charitable entity to operate the Museum – even if the Board terminated the Trust.

¶43 The Trustee's argument that the Museum cannot be the Trust's central purpose because the PURPOSES OF THE TRUST section does not specifically refer to the Museum conflicts with our well-established interpretational principles. Although subheadings may aid when interpreting a trust, according such dispositive effect to the subheading, as the Trustee suggests, would require us to elevate form over substance and to abandon our practice of discerning the trustor's intent from a sympathetic reading of the entire trust agreement, rather than from a particular word or phrase. *In re Estate of Snyder*, ¶ 10. The Trust Agreement's language contradicts the Trustee's and the Board's assertions that general philanthropy constituted the Trust's primary purpose, and we conclude that the Trust Agreement sets forth the establishment of the Museum as the primary purpose of the Trust.

20

**¶44 II Did the District Court correctly determine that the Board did not breach its fiduciary duties to the Trust?**

¶45 The State argues that the Board violated its fiduciary duties when it failed to use "whatever principal and income of the [Trust] that is necessary to establish, improve and maintain the museum," when it failed to give the Museum "first priority on income to be distributed from the Trust[,]" and when it closed the Museum without first determining that the Museum had ceased to serve its purposes.

¶46 Fiduciary duties arise as a matter of law in trustee relationships. Sections 72-34-101 to 72-34-207, MCA. Fiduciary duties include the duty to administer the trust according to the trust instrument, § 72-34-101, MCA; the duty of loyalty, § 72-34-103, MCA; the duty to use ordinary skill and prudence, § 72-34-114, MCA; and the duty to exercise discretionary powers reasonably, § 72-34-129, MCA. Further, a trustee must comply with the trustee's fiduciary duties when exercising the powers granted by a trust instrument. Section 72-34-303, MCA. We require that trustees perform their duties with "the punctilio of an honor the most sensitive . . . ." *Murphy v. Redland*, 178 Mont. 296, 309, 583 P.2d 1049, 1056 (1978) (quoting *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928)). Alberta Bair's Trust Agreement assigned duties to both the Trustee and the Board, and the parties agree that both the Trustee and the Board owed fiduciary duties to the Trust.

¶47 Whether a party has breached a duty generally presents a question of fact. *See e.g. Simmons v. Jenkins*, 230 Mont. 429, 435, 750 P.2d 1067, 1071 (1988) (discussing breach of the duty of good faith). We review a district court's findings of fact for clear error.

*Slauson*, ¶ 10. A finding is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if our review of the record convinces us that the district court committed a mistake. *Slauson*, ¶ 10. Implicit in the District Court's decision that the Board acted reasonably is the finding that the Board and the Trustee did not breach their fiduciary duties to the Trust:

> this Court finds and concludes that the Board of Advisors has aptly managed and overseen the duties with which they were charged. They have successfully and appropriately managed their part of the financial affairs of the trust; they have created, implemented, and funded the museum; and they have managed, improved, maintained and repaired the museum. In performing their duties, the Board has hired architects, engineers, museum consultants and appraisers. The Board has exercised its discretion with considered forethought and reasoning.

¶48 However, as discussed under Issue I, the District Court erroneously determined that the creation of the Museum was a discretionary decision. In light of the District Court's erroneous interpretation of the Trust Agreement, the District Court applied a deferential standard to the entirety of the Board's conduct relating to the Museum. As set forth below, based on our review of the record and considering the Board's and the Trustee's fiduciary duties imposed by law and under the Trust Agreement, we conclude that the District Court misapprehended the effect of the evidence and erred when it determined that the Board complied with its fiduciary duties. *Slauson*, ¶ 10.

*A.      Did the Board violate its fiduciary duty by failing "to use whatever principal and income" of the Trust necessary to "establish, improve and maintain" the Museum?*

¶49 The State argues that the Board breached its fiduciary duty to the Trust by choosing the "cheapest options possible" when establishing the Museum, by failing to

22

acquire the Bair residence and grounds, and by delegating its duty to administer and manage the Museum to CMR on a year-to-year operating contract.

¶50 The Board responds that the Trust's primary purpose was general philanthropy, rather than the Museum, but that it nonetheless "assumed the task of establishing the Museum judiciously . . . ." In support of its claim, the Board points to testimony from Michael O'Leary, an architect with CTA, who testified that the Board expressed no reluctance or unwillingness to complete work that O'Leary felt was necessary to open the Museum. The Board also cites to testimony from Lee Rostad, a member of the Friends of the Bair and a former member of the Board. Rostad testified that, during her tenure on the Board, she voted in favor of every dollar spent and that she never moved the Board to dedicate more money to the Museum.

¶51 The Board further asserts that the Trust Agreement vested the Board with "the absolute discretion to determine what amount of Trust income and principal was necessary to establish, improve, and maintain the Museum." The Board relies on the *Restatement (Second) of Trusts* for the proposition that, when a trust grants a board discretion to use whatever trust property the board deems necessary, a court should refrain from interfering with the board's discretion provided the board "applies at least the minimum amount which could reasonably be considered necessary . . . ." Section 187 cmt. e (1959). The Trustee then argues that the word "necessary" can have a multitude of meanings and asserts that the term required the Board to spend only the amount "reasonably required" for the Museum. The Board contends that it "[c]learly . . .

23

dedicated more than 'the minimum amount which could reasonably be considered necessary' to the Museum."

¶52 Trustees have a duty to "administer the trust according to the trust instrument" and according to Montana law. Section 72-34-101, MCA. In accomplishing the trust's purposes, trustees must exercise the "care, skill, prudence, and diligence" of a prudent person. Section 72-34-114, MCA. A trustor may modify these standards by including express provisions in the trust instrument. Section 72-34-114, MCA.

¶53 The Board's and the Trustee's arguments emanate from their fundamental misunderstanding of the Trust Agreement. The Board and the Trustee share the misconception that the Museum did not constitute the Trust's primary purpose; as discussed under Issue I, the Museum constituted the Trust's primary purpose. Further, the plain language of the Trust Agreement contradicts the Board's claim of "absolute discretion." The Trust Agreement provides that the Board "is directed to use whatever principal and income of the [Trust] *that is necessary* to establish, improve and maintain the museum, and shall have full discretion and authority to administer and manage the same." (Emphasis added.) Though the Trust Agreement grants the Board discretion to administer and manage the Museum, it grants the Board no discretion regarding the amount of principal and income to use in establishing, improving, and maintaining the Museum. On the contrary, the Trust Agreement directs the Board to use the amount of principal and income that actually is necessary to establish the Museum. In carrying out this directive, the Board was required to give the Museum a fair opportunity to succeed;

24

the Board was required to exercise the "care, skill, prudence, and diligence" of a prudent person. Section 72-34-114, MCA.

¶54 The Board and the Trustee misplace their reliance on the *Restatement* for a definition of the word "necessary" as the *Restatement* is both inapplicable to the language of the Trust Agreement and incongruent to Montana law. The *Restatement* provides that "*if* the trustee is empowered to apply so much of the trust property as he may deem necessary" courts will not interfere with a trustee's discretion provided the trustee applies "at least the minimum amount which could reasonably be considered necessary . . . ." *Restatement (Second) of Trusts* § 187 cmt. e (emphasis added). As discussed in ¶ 53, however, the Trust Agreement specifically does not empower the Board to apply the amount of trust property it "may deem necessary"; rather, it requires the Board to spend the amount of principal and income that actually is necessary.

¶55 The Board's and the Trustee's proffered definition of "necessary" also clashes with our rules of interpretation, which require that we construe an instrument's words in their "ordinary and grammatical sense . . . ." *In re Estate of Snyder*, ¶ 10 (citations omitted). Further, we refuse to apply a limited interpretation of the word "necessary," when the Trust Agreement itself contains no limiting language. *Matter of Estate of Lindgren*, 268 Mont. 96, 100, 885 P.2d 1280, 1282 (1994). In this case, we need not comprehensively define "necessary" because the Board's conduct in establishing, improving, and maintaining the Museum falls below even the limited definition offered by the Board and the Trustee.

¶56    Following Alberta Bair's death, the Board hired Leavengood Architects and CTA Architects Engineers to provide assessments and recommendations for converting the Bair Family residence into a museum. The Leavengood Study noted that converting a residence into a museum would require the "overhaul of many systems . . . to protect the art collection and accommodate visitors."

¶57    The Leavengood Study and CTA's Master Plan informed the Board of many challenges and concerns presented by the Bair Ranch, including inadequate fire suppression systems, inadequate security systems to protect against theft, and inadequate air-handling systems to protect the Museum's collection. Based on the remoteness of location and the lack of a professional fire-fighting department, the Leavengood Study recommended that the Board install a fire-sprinkler system as part of its fire-protection system. Similarly, CTA's Master Plan indicated the need for a fire-sprinkler water supply, and CTA proposed three different options to the Board for procuring a fire-sprinkler water supply. The Leavengood Study recommended that the Board consider using closed-circuit monitors and security personnel to minimize the risks of theft during the Bair Family residence's transition to a museum and noted that a more comprehensive security system would be needed after the museum was established. Both the Leavengood Study and CTA's Master Plan also recommended installing a new air-handling system that would provide stable temperature and humidity levels to protect the Museum's objects and archives from deterioration. Additionally, both the Leavengood Study and CTA's Master Plan advised the Board to construct additional structures to facilitate the Museum. The Leavengood Study estimated the costs for

pre-planning of the museum facility to be between $1,935,375 and $2,517,320, and CTA estimated the preliminary costs at $1,023,200.

¶58 Despite the recommendations from Leavengood and CTA, the Board failed to address the absence of a fire-sprinkler system – a concern Leavengood described as "paramount," and that CTA described as a high priority safety and security item. The Board also failed to install a new air-handling system to protect the Museum's collection. The CTA budget finally approved by the Board featured a truncated version of CTA's already abbreviated "Revised Project Cost Analysis – Minimum Operation," which estimated the cost of converting the Bair Ranch House to a museum at $328,000. The adopted proposal featured no improvements to the temperature and humidity systems or fire-sprinkler systems. The adopted proposal also included no mention of a security system or the construction of additional structures for the Museum. When it approved CTA's $328,000 proposal, the Trust was valued at approximately $23,000,000, and the Board had access to approximately $8,500,000 in Trust principal.

¶59 Though the Board ultimately spent approximately $600,000 on converting the Bair Ranch to the Museum, the Board failed to remedy the inadequate fire-protection system, the inadequate air-handling system, and to maintain an adequate security system. The Board also failed to construct additional buildings for the Museum. However, the Board cited to the absence of each of these items to support its decision to permanently close the Museum: according to the Board and the Trustee, the decision to close the Museum was based on multiple considerations, including the "risk of theft;" the "risk of damage to fine art by keeping it in a house without proper environmental controls;" the "risk of fire and

limited fire protection in the area associated;" and "space limitation[s] in the home that made it difficult to rotate and display the art and artifacts . . . ." Though a security system initially was installed at the Museum, the record reveals that the Board later specifically rejected the installation of surveillance cameras at the Museum, and the Board's reliance on the risk of theft as a justification to close the Museum indicates that the Board failed to properly maintain the security system. By relying on these factors to justify closing the Museum, the Board implicitly acknowledged that addressing these deficiencies at the outset was necessary to properly establish and maintain the Museum.

¶60 The Board breached its duty to administer the Trust according to the trust instrument and breached its duty to administer the trust with the "care, skill, prudence, and diligence" of a prudent person when it failed to install a fire-prevention system, failed to install a proper air-handling system, failed to maintain an appropriate security system, and when it failed to build additional structures for the Museum. Sections 72-34-101 and 72-34-114, MCA. Although the Board considered the Bair Ranch's inadequate systems and buildings as factors supporting its decision to close the Museum, the Board's initial failure to address these limitations, especially in light of Leavengood's and CTA's recommendations, more accurately demonstrates the Board's failure to comply with its fiduciary duties to the Trust. The Board's failures to address the non-existent fire-sprinkler system, the deficient air-handling system, the insufficient security system, and the Museum's space limitations constitute breaches of the Trust Agreement's directive to "use whatever principal and income of the [Trust] that is necessary to establish, improve and maintain the museum . . . ." As the Board chairman

so aptly observed in his 2003 email to the Trust members regarding repairs, the Museum "was never really made 'museum ready' in 1995 when it opened." We agree with the Board chairman's assessment.

¶61 The Board's failure to make the Museum "museum-ready" constitutes a breach of the Board's fiduciary duty to the Trust. Though the Board has consisted of different individual members since its inception, the current Board is liable for the breaches of predecessor Boards. The Board's Memorandum of Decision closing the Museum establishes that the current Board knew of situations "constituting a breach of trust committed by the predecessor" Boards and that the current Board failed to redress those breaches of trust. Section 72-34-504, MCA.

¶62 The State also argues that the Board breached its fiduciary duties to the Trust by leasing the "house and grounds from a bank-controlled entity on terms that would not allow the Trust to recoup any investments in improvements." According to the State, the Trust Agreement "clearly contemplated" the purchase of the Bair residence and surrounding grounds. We agree.

¶63 We seek to determine the trustor's intent from the language of the trust agreement. *Matter of Estate of Bolinger*, 284 Mont. at 120, 943 P.2d at 985. After describing that the creation of the Museum had long been Alberta Bair's "cherished aim and foremost desire[,]" the Trust Agreement states:

> It is therefore Grantor's will that the Board of Advisors devote Grantor's entire residence, together with all personal property of lasting historical and artistic value located therein, and together with surrounding grounds and outbuildings necessary for such purpose, to the establishment of a museum . . . . In fulfilling its purposes of opening the museum . . . the Board of

29

> Advisors shall have the authority to acquire required additional land, erect and/or maintain existing structures suitable to the operation of a museum . . . .

(Paragraph breaks omitted.)

¶64 In 1994, the Trustee entered into a five-year lease, with a three-year renewal option, for the Bair Family residence and the surrounding grounds and outbuildings with THE BAIR CO., a Montana corporation that later became the Bair Ranch Foundation. The lease provided that, at the end of the five-year term, the Trustee "shall surrender the leased premises and improvements to [the Bair Ranch Foundation] in as good a condition" as at the beginning of the term. Further, the lease provided that any non-removable improvements or additions would become the Bair Ranch Foundation's property and that the Trustee was entitled to no compensation for the improvements or additions. The lease functioned as more than a token formality: the Trust Administrator testified that the Board would be required to obtain the Bair Ranch Foundation's permission before the Board could build another restroom at the Museum's visitor center.

¶65 The Trust Agreement simply does not authorize the Board to enter into a short-term lease to rent the residence and outbuildings; rather, it sets forth Alberta Bair's will that the Board "devote" the residence to the establishment of the Museum. The verb "devote" means "1. To give or apply (one's time, attention, or self) entirely to a particular activity, pursuit, cause, or person. 2. To set apart for a specific purpose or use . . . . 3. To set apart by or as if by a vow or solemn act; consecrate . . . ." *American Heritage Dictionary of the English Language* 497 (4th ed. Houghton Mifflin Co. 2000). The "ordinary and grammatical sense" of the verb "devote" carries more import than the

Board grasped. *In re Estate of Snyder*, ¶ 10. In short, the Board could not "set apart" Alberta Bair's entire residence, the surrounding grounds, and the outbuildings for the establishment of a museum that would "perpetuate the historic and artistic significance" of the Bair Ranch when it possessed only a five-year lease and was required to ask for permission to build a restroom. Moreover, the Trust Agreement granted the Board the authority to "acquire required additional land, erect and/or maintain existing structures suitable to the operation of a museum . . . ." Underlying the use of the term "additional" is the presumption that the Board would already have acquired the residence and the surrounding outbuildings. We conclude that the Board's failure to purchase the Bair Family residence constitutes a breach of the Trust Agreement.

¶66 The State also argues that the Board breached its fiduciary duties when it delegated its duty to "administer and manage" the Museum to CMR rather than establishing a separate charitable entity to operate the Museum, as authorized by the Trust Agreement. The State points to the current Board chairman's statement – that the Museum "band-aided itself along through it's [sic] 8 years of operations" and Peter Hassrick's statement – that "the Bair Museum was given what I would call 'step-child' treatment and not afforded a fair chance to survive on its true merits" – to illustrate the Board's failure.

¶67 The State's argument that the Board's delegation constitutes a breach of its duty to "administer and manage" the Museum presents a closer question because the Trust Agreement granted the Board "full discretion and authority to administer and manage" the Museum. Discretionary powers must be exercised reasonably. Section 72-34-129,

31

MCA. We conclude that the Board did not breach its duty to the Trust when it delegated the Museum's management to CMR. The Board members had no prior experience managing a museum, and, though it may have been reasonable for the Board to establish a separate legal entity to manage the Museum, we cannot say that it was unreasonable for the Board to hire CMR to manage the operations of the Museum. Though Hassrick's and the Board chairman's comments arguably may suggest that the Board failed to comply with its duty under § 72-34-113, MCA, to "exercise general supervision" over CMR, that issue is not before the Court.

*B. Did the Board violate its fiduciary duty by failing to give the Museum "first priority" on the income that the Board distributed from the Trust?*

¶68 The State argues that the Board breached its duty to give the Museum first priority on the Trust's income by disbursing more money through charitable grant-making than it spent to support the Museum. According to the State, the Trust Agreement's provision that the Museum "shall have first priority on income to be distributed from the Trust" means that the Museum was to receive more money than other recipients. The State argues that the Board's failure to grant the Museum first priority on income arises from the Board's lack of a formal conflict of interest policy.

¶69 The Board and the Trustee respond that "first priority" means that the Board was required to provide the Museum the "first right to the income to be distributed[,]" not that the Board was "required to grant the Museum more money . . . ." The Trustee maintains that the Trust Agreement requires the Board to grant the Museum "first crack at whatever amount it reasonably required in the event there is a shortage of available Trust income."

32

¶70 We seek to determine the trustor's intent from the language of the trust agreement. *Matter of Estate of Bolinger*, 284 Mont. at 120, 943 P.2d at 985. The Trust Agreement requires the Board to use "whatever principal and income of the [Trust] that is necessary to establish, improve and maintain the museum" and provides that the Museum "shall have first priority on income to be distributed from the Trust by the Board of Advisors." The Board breached its duty to the Trust under either of the offered definitions of "first priority." As discussed in ¶¶ 60-61, the Board failed to distribute the necessary amount of principal and income to establish, improve, and maintain the Museum; the Board has yet to make the Museum "museum-ready." Nonetheless, in every year since the Trust's inception, the Board has distributed money through charitable grants. Regardless of the definition of "first priority," the Board's failure to properly fund the Museum while at the same time making charitable distributions demonstrates the Board's failure to accord the Museum first priority to the Trust's income. The Board's failure to give the Museum first priority on income constitutes a breach of its duty to administer the Trust according to the Trust Agreement. Section 72-34-101, MCA.

*C.* *Did the Board violate its fiduciary duty by closing the Museum without first finding that it had "ceased to serve the purposes thereof so as to make it inadvisable to continue the museum for public and educational purposes"?*

¶71 The State contends that the Board breached its fiduciary duties by closing the Museum without first determining that the Museum had "ceased to serve" its scholarly, educational and historical purposes. The State argues that, rather than determining that the Museum had ceased to serve its purposes, the Board determined that the Museum

33

could better serve its purposes elsewhere. According to the State, the Board's rationales for closing the Museum fail to show that the Museum had ceased to serve its purposes.

¶72 The Board and the Trustee respond that the Trust Agreement grants the Board "unfettered or absolute discretion to close the Museum, if, 'acting in it's [sic] <u>sole</u> judgment and discretion' the Board determines that the Museum no longer meets the scholarly, educational and historical purposes 'so as to make it inadvisable to continue the museum for public and educational purposes.'" (Emphasis added by the Board.) The Board asserts that, absent an abuse of discretion, principles of trust law preclude a court from overruling the Board's discretionary decision to close the Museum. The Board and the Trustee then set forth a litany of reasons relied on in making the decision to close the Museum.

¶73 We seek to determine the trustor's intent from the language of the trust agreement. *Matter of Estate of Bolinger*, 284 Mont. at 120, 943 P.2d at 985. The Trust Agreement provides that:

> If, at any time following the fifth anniversary of [Alberta Bair's] death, the Board of Advisors, acting in its sole judgment and discretion, shall determine that the [Museum] has ceased to serve the purposes thereof so as to make it inadvisable to continue the museum for public and educational purposes, . . . then and in any such event the [Board] is thereupon authorized and empowered to sell, transfer, relocate the museum, or otherwise dispose of all of the property then held as a part of the [Museum] . . . .

The language of the Trust Agreement grants the Board the authority to close the Museum if certain conditions were satisfied. The Trust Agreement's grant of "sole judgment and discretion," clearly expresses Alberta Bair's intent that the Board should have significant

34

discretion to determine whether the Museum had ceased to serve its purposes. Nevertheless, the Board's claim of "unfettered" discretion overstates the Trust Agreement's grant of authority. The Trust Agreement specifies that the "applicable statutes of the State of Montana and the decisions of its courts" apply to the Board's and the Trustee's powers. Montana law provides that a trustee endowed with "absolute" or "sole" discretion must "act in accordance with fiduciary principles and may not act in disregard of the purposes of the trust." Section 72-34-130, MCA.

¶74 Additionally, charitable trusts significantly differ from private trusts. While private trusts generally have easily identifiable beneficiaries who possess standing to enforce a trust, charitable trusts generally have no beneficiaries empowered to enforce a trust; individuals receive a benefit because "they are conduits through whom the social gains flow and not because they are beneficiaries who can qualify as enforcers of the trust." Ronald Chester, George Gleason Bogert & George Taylor Bogert, *The Law of Trusts and Trustees* § 411, 2 (3d ed., West 2005). The public benefits emanating from charitable trusts justify the traditional selection of the Attorney General's office as the enforcer of charitable trusts because the Attorney General's office serves as the protector of a state's citizens. Chester et al., *The Law of Trusts and Trustees* at § 411, 3. Accordingly, a charitable trust is never truly "unfettered" because the Attorney General's office always serves as the "protector, supervisor, and enforcer of charitable trusts." Chester et al., *The Law of Trusts and Trustees* at § 411, 3. In Montana, the Attorney General has the statutory right and obligation to initiate a lawsuit to enforce a charitable trust. Section 72-33-503, MCA. Thus, under Montana law, both the Attorney General's

office and the courts play vital roles in the oversight of charitable trusts. In light of these parameters, the proper standard is whether the Board complied with its fiduciary duties and its duties under the Trust Agreement.

¶75 The Connecticut Supreme Court of Errors, in *Conway v. Emeny*, 96 A.2d 221 (Conn. 1953), addressed the scope of "absolute discretion" under strikingly similar facts. In *Conway*, the testator left her home to trustees to maintain as a museum for the general public. Her will provided that, "at any time after three years from the probating of her will" the trustees, by a two-thirds vote, "should 'in their absolute discretion determine that there is not sufficient public interest in the Museum to warrant continuing to maintain' it, the trust . . . should terminate, and all of the museum property . . . should be transferred to the bank in trust" for a local school's benefit. *Conway*, 96 A.2d at 222. Relying on their grant of absolute discretion, the trustees voted to close the museum. The court noted that the trustees considered factors other than whether the museum had sufficient public interest, including what the testator would have done if she were still living and financial difficulties they feared the museum might face in the future. The court noted that none of the individual trustees voting to close the museum were "actuated solely or principally by the belief that there was not sufficient public interest in the museum to keep it open." *Conway*, 96 A.2d at 223-24.

¶76 The Connecticut Supreme Court of Errors held that the trustees violated their duties by considering standards other than public interest. *Conway*, 96 A.2d at 225. The court stated that, though the word "absolute" gave the trustees considerable discretion, the discretion was not unlimited. The court then cited to three conditions that the testator

36

imposed on the trustees' discretion: (1) the museum could not be closed in the initial three years following the will's probate; (2) two-thirds of the trustees had to approve of the museum's closure; and (3) the trustees were required to, "'in their absolute discretion determine that there is not sufficient public interest in the Museum to warrant' their maintaining it." *Conway*, 96 A.2d at 224. The court stated that, although the third condition conferred discretion on the trustees, the testator had "set the standard for exercising discretion": insufficient public interest. *Conway*, 96 A.2d at 224. According to the court:

> The stubborn fact which the [trustees] cannot avoid is that, wisely or not, the testatrix established a standard to guide the trustees and to limit their action. This was whether there was sufficient public interest in the museum to warrant continuing to maintain it. It was the duty of the trustees to conform strictly to the directions which the testatrix gave. Trustees have no powers not expressly or impliedly conferred on them by the terms of the trust. . . . Their obligation to obey the instructions of the donor of the trust is the cornerstone upon which all other duties rest. . . . The failure of the trustees to apply the standard of public interest in reaching their decision to close the museum was a violation of their duty. They took unto themselves a power not granted them by the will.

*Conway*, 96 A.2d at 224-25 (citations omitted). The court noted that the trustees violated their duties to the trust by ignoring the testator's sole standard even if their purposes were commendable and even though the trustees did not act for personal gain. *Conway*, 96 A.2d at 225.

¶77 In this case, the Trust Agreement's language granting the Board "sole judgment and discretion" expresses Alberta Bair's intent that the Board should possess considerable discretion. As in *Conway*, however, the Trust Agreement imposes conditions on the Board's discretion: (1) absent destruction by "fire or other cause[,]" the

37

Museum could not be closed in the five years following Alberta Bair's death; (2) a majority of the Board had to approve the Museum's closure; and (3) the Board was required to determine, exercising its sole discretion, that the Museum had "ceased to serve" the scholarly, educational, and historical purposes to the extent that it was "inadvisable to continue the museum for public and educational purposes . . . ." As in *Conway*, although the third condition grants the Board discretion, the Trust Agreement plainly sets the standard that the Board must consider when exercising that discretion: the Museum must have ceased to serve its purposes to such an extent that it is inadvisable to continue the Museum.

¶78    In its 2005 Memorandum, the Board explained the reasons underlying its decision to permanently close the Museum, including declining attendance, the Bair collection's increased value, the costs associated with reopening and running the Museum, and the remoteness of the Museum's location. In their briefing to this Court, the Board and the Trustee present an expanded catalog of reasons justifying the Board's decision to permanently close the Museum:

> (1) steadily declining attendance, despite significant advertising; (2) risk of theft; (3) risk of damage to fine art by keeping it in a house without proper environmental controls; (4) risk of fire and limited fire protection in the area associated; (5) steady increase in the value of the fine art, which multiplied the risks of fire, theft or damage due to improper environmental controls; (6) lack of community support in buying annual memberships; (7) alternatives that could allow more people to experience the historical and educational aspects of the Bair Collection, as outlined by its expert Peter Hassrick; (8) space limitation in the home that made it difficult to rotate and display the art and artifacts; and (9) the inability to alter many of the conditions that were of concern, no matter how much money was spent.

Though the Board's and the Trustee's concerns may be valid, they fail to justify the Museum's closure because they fail to address the standard required by Alberta Bair's Trust Agreement. At the time she executed her Trust Agreement, Alberta Bair contemplated many of the concerns cited by the Board and the Trustee. For example, Alberta Bair certainly was aware of Martinsdale's remote location, the risks associated with fire, and the space limitations of the Bair Ranch house. In fact, Alberta Bair specifically acknowledged in the Trust Agreement that fire posed a risk to the Museum, and the Trust Agreement authorized the Board to dispose of the Museum and the remaining property if a fire so damaged the property that repair became impossible, impractical, or inadvisable. Further, Alberta Bair clearly recognized that the Bair Ranch house and surrounding buildings may prove insufficient to the Museum's needs; accordingly, the Trust Agreement authorized the Board to "acquire required additional land," and to "erect and/or maintain existing structures suitable" to the Museum's operation.

¶79    Moreover, many of the Board's and the Trustee's justifications for closing the Museum result from the Board's breach of its duty to "use whatever principal and income" necessary to establish the Museum. As early as 1993, the Board knew of the risks presented by fire damage and the limited availability of fire protection, the risks of loss from theft, the risk to the collection from improper environmental controls, and the Museum's possible space limitations. The Leavengood Study and the CTA Master Plan identified these concerns and provided recommendations to the Board. As discussed in

¶¶ 60-61, the Board's failures to initially address these areas constitute breaches of its fiduciary duties.

¶80   The Board's and the Trustee's justifications relating to the art collection's increase in value, the Museum's declining attendance, and the lack of annual memberships in the community also fail to address the standard required by the Trust Agreement. In the interim between the Museum's temporary closure and permanent closure, the value of the art collection increased from $4,792,232 to $6,690,532. This increase in value is consistent with prior increases, according to Sotheby's appraisals. While such increases in value may motivate the Board to purchase additional insurance or to address inadequacies in fire and theft protection, we fail to see how such dramatic increases could be anything short of a boon to a rural museum – they provide absolutely no support to the Board's determination that the Museum had ceased to serve its purposes.

¶81   Additionally, the Board and the Trustee both acknowledge that the Museum enjoyed more than 4,000 visitors in every year that it was open. Though the Board is correct to address the Museum's declining attendance, the record fails to support the Board's claim that the Museum's declining attendance is "irreversible." Both CMR and Peter Hassrick offered suggestions to address the declining attendance, including hiring a professional museum administrator to give year-round attention to marketing and fund-raising, as well as to handle other responsibilities; underwriting public radio programs; creating traveling exhibits throughout Montana; and expanding the educational outreach by negotiating with Montana State University to offer courses related to the Museum's collection and exhibits. Further, at no point has the Board set forth a level of attendance

at which the Museum would cease to serve its scholarly, educational, and historical purposes. Although the Board justifiably may be concerned with the Museum's declining attendance, a museum that educates 4,000 visitors a year has not yet ceased to serve its purposes under any standard.

¶82   Moreover, the Trustee finds no refuge in its assertion that the Trust Agreement's language – that the Board has the discretion to close the Museum if the Board determines that the Museum "has ceased to serve the purposes thereof so as to make it inadvisable to continue the museum for public and educational purposes" – focuses on whether it is "inadvisable" to continue the Museum, rather than whether the Museum has "ceased to serve" its purposes. Since Alberta Bair's death, the Board has hired at least five experts to advise the Board on the Museum's operation. None of the Board's experts have advised the Board that the Museum can no longer serve its public and educational purposes. On the contrary, the Board's first expert, Leavengood, stated that the Museum had the "potential of being a world-class institution. . . . [T]he museum's future is bright and needs only careful guidance." Similarly, the Board's most recent expert, Hassrick, provided the Board a detailed proposal for reopening the Museum in Martinsdale and stated that the Museum was a "unique experience for the region. . . . There is certainly nothing like the Bair Museum in Montana . . . ."

¶83   The Board's Memorandum of Decision closing the Museum indicates that, rather than following the Trust Agreement and inquiring whether the Museum had ceased to serve its purposes, the Board instead sought to determine whether the Museum's purposes could be better served elsewhere. The Board's Memorandum reflects this new

standard: "[t]he Board has determined that the educational, scholarly, and artistic purposes of the Museum can be better served by its exhibition in an area more accessible and more populated." The Board concluded its Memorandum by stating that "the Board is determined that the story of the Bair Family and its remarkable place in Montana's history will be told, and told more effectively and to more individuals than ever possible at the Museum in Martinsdale." The Board granted itself a power not granted by the Trust Agreement when it sought to determine whether the Museum's purposes could be better served elsewhere, rather than considering whether the Museum had ceased to serve its purposes. While the Board's quest to more effectively tell the Bair Family's story may be commendable, it is nonetheless a breach of the Board's duty to the Trust.

¶84 **III Did the District Court correctly determine that the Friends of the Bair had standing to intervene in this action?**

¶85 In its cross-appeal, the Trustee asserts that the District Court erroneously determined that the Friends of the Bair had a "special interest" in the Trust, and thus, the District Court incorrectly allowed the Friends of the Bair standing to intervene in this action. The Friends of the Bair respond that their special interest in the Bair Trust grants them standing. The Friends of the Bair propose that we consider four factors to determine whether a party has standing to enforce a charitable trust: (1) the "extraordinary nature of the acts complained of and the remedy sought by the plaintiff"; (2) the "presence of fraud or misconduct on the part of the charity or its directors"; (3) the "attorney general's availability or effectiveness"; and (4) the "the nature of the benefited class and its relationship to the charity." Additionally, the Friends of the Bair claim that

42

Lee Rostad, a member of the Friends of the Bair, has standing based on her position as a former Board member.

¶86    Under Montana law, the Attorney General, a co-trustee, or a person possessing a "special interest in the enforcement of the charitable trust" has standing to sue to enforce a charitable trust. Section 72-33-503, MCA. A district court's determination on standing is a conclusion of law, which we review for correctness. *Druffel v. Board of Adjustment*, 2007 MT 220, ¶ 9, 339 Mont. 57, ¶ 9, 168 P.3d 640, ¶ 9. However, we refuse to render advisory opinions, and if our judgment will not grant effective relief, the matter is moot. *Clark v. Roosevelt County*, 2007 MT 44, ¶ 11, 336 Mont. 118, ¶ 11, 154 P.3d 48, ¶ 11.

¶87    We decline to resolve whether the District Court erred when it determined that the Friends of the Bair had standing in this matter. As the Trustee correctly observes, the Attorney General has the "right and obligation to represent the public in matters involving charitable trusts . . . ." Further, the Trustee notes that the Attorney General intervened in the present litigation "as a matter of right, on behalf of the State of Montana." Since the State is a proper party and has appealed the District Court's decision, the Trustee is a party to the appeal regardless of the Friends of the Bair's presence. To decide whether the Friends of the Bair have standing would amount to nothing more than an academic exercise; even if we concluded that the District Court erred, our decision would grant no effective relief to the parties and would yield only an impermissible advisory opinion. *Clark*, ¶ 11.

¶88    **IV    The proper remedy for the Board's breach of its fiduciary duties.**

43

¶89    The State requests that we remand this case to the District Court to order the removal of the Trustee and the Board from the Museum and the Bair collection. The State further requests that we direct the District Court to order the creation of an independent charitable entity to operate the Museum and that the entity receive sufficient Trust funds to endow the permanent support of the Museum and its collection.

¶90    Several remedies exist for breach of a trust. For example, a court may compel the trustee to perform its duties, enjoin the trustee from breaching the trust, compel the trustee to redress a breach of trust, appoint a receiver or temporary trustee to administer the trust, or remove the trustee. Sections 72-33-618 and 72-34-506, MCA. The remedies for breach of trust lie exclusively in equity. Section 72-34-507, MCA. When sitting in equity, we are empowered to do complete justice, including the power to fashion an equitable result. *In re Guardianship of Saylor*, 2005 MT 236, ¶ 33, 328 Mont. 415, ¶ 33, 121 P.3d 532, ¶ 33 (citations omitted).

¶91    The Trust Agreement granted the Trustee no power to determine the amount of principal and income necessary to establish, improve, and maintain the Museum. Nor did the Trust Agreement grant the Trustee a decision-making role in determining whether to close the Museum. The Trust Agreement directed the Board to spend the necessary principal and income to establish, improve, and maintain the Museum, and the Trust Agreement granted the Board the decision-making power to close the Museum, subject to the standard set forth in the Trust Agreement. Though the Trust Administrator appears to have played a part in the Board's decision to close the Museum, the Board made the decisions regarding the Museum. The Board, not the Trustee, breached its fiduciary

44

duties to the Trust by failing to spend "whatever principal and income" of the Trust that was "necessary to establish, improve and maintain" the Museum. The Board, not the Trustee, breached its fiduciary duties to the Trust by closing the Museum without determining that the Museum had "ceased to serve the purposes thereof so as to make it inadvisable to continue the museum for public and educational purposes . . . ." We conclude that removing the Trustee from the Trust is unnecessary considering that the Trustee breached no duty to the Trust.

¶92 The Board's breaches of its fiduciary duties to the Trust do not appear to stem from any bad-faith motives on the part of the Board, but rather from the Board's misconception that the Museum was not the primary purpose of the Trust. The Board's misconception resulted in the Museum receiving less than it deserved and less than Alberta Bair's Trust Agreement demanded. As a result of the Board's failure to spend "whatever principal and income of the Charles M. Bair Family Trust that is necessary to establish, improve and maintain the museum," the Museum never received a fair opportunity to succeed; the Museum was destined for failure, rather than success. The Board's ensuing breaches emanated from this initial failure. Given that the Board's misconceptions led to the Board's breaches of its duties, we deem it appropriate that the Board redress its breaches of trust with the proper understanding of the Museum as the primary purpose of the Trust.

¶93 Thus, we reverse the District Court, and we instruct the Trustee to appoint a new Board in accordance with Section 6.2(d) of the Trust Agreement. Section 6.2(d) of the Trust Agreement provides that the Board shall consist of five persons: the president of the

45

First Trust Company of Montana, or the president's nominee; the president of First Bank (N.A.), or the president's nominee; the president of Moulton, Bellingham, Longo & Mather, P.C., or the president's nominee; and two individuals designated by the Trustee from the counties of Meagher, Wheatland, and Yellowstone, with not more than one member appointed from either Meagher or Wheatland county.

¶94 Throughout this litigation, the Board members have "frozen" their terms. At this point, the members designated by the Trustee have served more than the maximum three-year term allowed by the Trust. We instruct the Trustee to appoint two new members to the Board in accordance with § 6.2(d) of the Trust Agreement. Further, to properly redress the Board's breaches, the current Board members who would remain members based on their positions as presidents of First Trust Company of Montana, First Bank, and Moulton, Bellingham, Longo & Mather, P.C., or their successors, must each appoint a nominee to serve on the Board, as allowed by the Trust Agreement. We direct that the new Board members must be appointed and that the newly-constituted Board must conduct its first formal meeting within six months from the date of this decision.

¶95 We instruct the new Board to follow the directive of Alberta Bair's Trust Agreement to spend "whatever principal and income" of the Trust that is "necessary to establish, improve and maintain" the Museum and to ensure the Trust's primary purpose, the Museum, receive a fair opportunity to succeed. We acknowledge the Trust Agreement's language providing that "following the fifth anniversary" of Alberta Bair's death, the Board was empowered to "sell, transfer, relocate the museum, or otherwise dispose of all the property" if the Board determined that the Museum had ceased to serve

46

its scholarly, educational, and historical purposes to the extent that it became "inadvisable to continue the museum for public and educational purposes . . . ." We conclude that allowing the Board the exercise of this discretionary power at any time following the fifth anniversary of the new Board's first formal meeting would most comport with the intent of Alberta Bair.

¶96   Reversed.

/S/ W. WILLIAM LEAPHART


We concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ JOHN WARNER
/S/ BRIAN MORRIS




Justice Jim Rice concurring.

¶97   I concur with the Court's holding herein, but have concerns about parts of the rationale employed. I fear that certain conclusions in the Opinion may interfere with the proper exercise of the Board's discretion in the future management of the Trust. I also feel that the Court's Opinion has made what was no doubt a very difficult decision by the Board—closing the Museum—seem like it was arbitrarily made and a clear-cut violation of the Board's discretion and its fiduciary duty to the Trust. While our decision rightly

47

interprets the Trust Agreement, properly concluding that the Museum was the foremost purpose of the Trust and its closure premature, the question of whether to close the Museum was not, in my view, "black and white"; indeed, there was language in the Trust which authorized closure under the appropriate circumstances. Though I agree that those circumstances had not yet occurred, it is yet possible they will occur in the future, and at that time the Board must be able to properly fulfill its duty. Similarly, other future decisions may very well involve complexities which require careful analysis of different options by the Board and the exercise of considerable discretion. This holding, while properly correcting the Board's course, should not also impede the proper exercise of discretion by the Board required by changing conditions and future circumstances.

¶98    I agree with the Court's declining to "comprehensively define 'necessary'" for purposes of maintaining the Museum. ¶ 55. However, despite that conclusion, the Court holds that the Board breached its duty when it "failed to install a fire-prevention system, failed to install a proper air-handling system, failed to maintain an appropriate security system, and when it failed to build additional structures for the Museum." ¶ 60. The necessary implication is that if the Board fails to complete each of these tasks, the Board will remain in breach of its duty. While I agree that the Board's failure to complete the aforementioned measures is evidence supporting the breach of duty, I do not believe it should now become incumbent upon the Board to complete all items on the list, some being expensive and some without specificity ("build additional structures"), without further consideration by the Board. The Board voted to close the Museum temporarily over five years ago and voted to permanently close the Museum over three years ago. It

should not have to initiate upgrades without updating data and options. The record reveals that there are various studies and opinions about how the facility can be made museum-ready, and not all of them contain the same proposals. It is possible that the Board will adopt a plan which would be deemed appropriate, but not contain all of the items mentioned in the Court's Opinion. Such explicit directions could well put overly strict limitations on the Board's "full discretion and authority" to act in the best interest of the Museum. Although a different case entirely, and a constitutional one, in *Columbia Falls Elementary School v. State*, 2005 MT 69, 326 Mont. 304, 109 P.3d 257, we held that it was the Legislature's duty to first define a "quality" education. *Columbia Falls*, ¶ 31. Here, I would defer to the Board to first define "museum-ready."

¶99 I have similar concerns under Issue II(C). The Trust Agreement explicitly provides that the Board may exercise its "sole judgment and discretion" to close the Museum, which the Court acknowledges is a grant of "significant" or "considerable" discretion. However, despite that initial acknowledgement, the discussion under Issue II(C) does not appear to give any particular deference to this "considerable" discretion. While I agree that the Board's decision to close the Museum under the conditions as they existed was a breach of duty, and that its discretion is not absolute, the Board must retain significant discretion to act in the future on an issue of this complexity and other issues. Not knowing what the public response will be to the Board's actions to make the Museum ready, it is conceivable that the issue of closure could again arise and need to be revisited in a future year. If that happens, the Board must be able to fulfill its duties with the full powers bestowed upon it by the Trust Agreement. The Court rejects, point-by-

point, each reason the Board offered for closing the Museum. While these reasons were not adequate today, future events could make these reasons, supported by different facts, appropriate another day.

¶100   I concur.

/S/ JIM RICE