

DA 12-0325

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2013 MT 108

MAXINE S. LANE,

      Petitioner and Appellant,

    v.

LINDA CALER, Trustee of MAXINE LANE
IRREVOCABLE TRUST, and STEWART
TITLE OF MISSOULA, INC.,

      Respondents and Appellees.

APPEAL FROM:    District Court of the Fourth Judicial District,
                      In and For the County of Missoula, Cause No. DV 11-883
                      Honorable Edward P. McLean, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Raymond P. Tipp; Torrance L. Coburn; Tipp & Buley, P.C.;
                Missoula, Montana

        For Appellees:

                Spencer T. MacDonald; MacDonald Law Office, PLLC;
                Missoula, Montana

                             Submitted on Briefs:  February 13, 2013

                                      Decided:  April 23, 2013

Filed:

_____
                                 Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Maxine S. Lane (Maxine or Beneficiary) appeals from the order of the Fourth Judicial District Court granting summary judgment in favor of Linda Caler (Linda or Trustee). We affirm, and address the issue:

¶2 *Did the District Court correctly interpret the Maxine Lane Irrevocable Trust to require the Trustee to distribute $100,000 to Maxine's brothers when the trust property was sold during Maxine's lifetime?*

### FACTUAL AND PROCEDURAL BACKGROUND

¶3 In 2003, with her mother's contribution of the $50,000 down payment, Maxine was able to purchase a residence (the Property, house or residence) located in the Rattlesnake area of Missoula, where she lived until the Property was sold in July 2011. Maxine's remaining debt for the Property's purchase was originally secured by a fixed-rate mortgage, but she refinanced the debt with an adjustable-rate mortgage in 2004. When the interest rate spiked in 2007, Maxine was unable to continue to make the monthly mortgage payments.

¶4 Maxine's family stepped in to help her keep the house. Her mother paid off the remaining $203,278.23 owed against the Property, leaving the title free and clear. Maxine transferred title of the Property to the newly created Maxine Lane Irrevocable Trust (the Trust). The Trust strictly prohibited any encumbrances on the Property. The Trust Agreement provided that if the Property was sold during Maxine's lifetime,

2

$50,000 was to be paid to each of Maxine's brothers, Homer J. Steiner III (Homer) and Karl Frederick Steiner (Karl), or a total payment of $100,000. Maxine's daughter, Linda, was named as the Trustee of the Trust, Maxine was its sole beneficiary, and the Trust's sole asset was the Property. The Trust's only source of income was rent paid by Maxine and other tenants who lived in the Property, and this income was used for repair and maintenance.

¶5 In 2009, the house's septic system began backing up. A septic company cleared the blockage, which prevented further backups so long as Maxine strictly monitored her water use. To permanently fix the problem, Linda suggested connecting the house to the city sewer system. However, at this point, the Trust funds were depleted because Maxine had stopped paying rent and the tenants had moved out. Maxine's other daughter, Jackie, offered to make an interest-free, unsecured loan to the Trust to finance the sewer work. Jackie required no loan payments, asking only that the loan be repaid without interest when the house was sold, but did attach two conditions for the loan: (1) that Maxine comply with the Missoula City Ordinance governing the number of dogs allowed on the Property, and (2) that Maxine keep no more than four dogs on the Property even if the City permitted her to keep more. Jackie and Linda expressed concern that tenants would not be willing to rent rooms if Maxine continued to keep eight to twelve dogs in the house as she had in the past.[1] Maxine rejected Jackie's loan offer in favor of keeping the

---

[1] Maxine bred and raised long-haired miniature Dachshunds.

dogs. Because the Trust prohibited any encumbrances on the Property, no commercial lender was willing to make an unsecured loan to cover the sewer work.

¶6 From January 2010 until the Property was sold in July 2011, Maxine lived in the house but did not pay rent. Because the Trust had no funds, Maxine's mother and daughters contributed funds to the Trust to pay the property taxes and homeowner's insurance for the Property. Maxine acknowledged that the house needed repairs for which the Trust lacked funds. In 2011, she agreed to move out and consented to the sale of the Property. The Property sold, and the Trust received $176,469.16 in net proceeds. Maxine's desire was that the proceeds of the sale would be used to purchase a new house for her. However, the Trustee indicated she was obligated to first make the $50,000 distributions to Homer J. Steiner III and Karl Frederick Steiner as stated in the Trust, and then use the remaining proceeds for Maxine's support. Maxine objected to the distributions. In the meantime, Maxine moved into a rental unit. The Trust paid for Maxine's moving expenses, rental of a storage unit, the security deposit, and continues to pay her monthly rent.

¶7 On July 6, 2011, Maxine filed a declaratory judgment action in the District Court against Linda, in her capacity as Trustee.[2] Maxine asked the court to determine whether the Trust required the sale proceeds to be used to purchase another residence for Maxine, or whether the Trust required the $50,000 distributions be made. The parties filed

---

[2] Maxine joined Appellee Stewart Title to prevent it from distributing the proceeds of the sale until the District Court resolved the dispute. Stewart Title subsequently deposited all of the proceeds with the court and had no further involvement in the case.

4

cross-motions for summary judgment. The District Court granted summary judgment to Linda, concluding that the Trust mandated the Trustee to make the distributions.

¶8 Maxine appeals.

## STANDARD OF REVIEW

¶9 The District Court's interpretation of a trust agreement "presents a question of law, which we review for correctness." *In re Charles M. Bair Family Trust*, 2008 MT 144, ¶ 32, 343 Mont. 138, 183 P.3d 61 (hereinafter *Bair Family Trust*); *In re Cecilia Kincaid Gift Trust for George*, 2012 MT 119, ¶ 7, 365 Mont. 179, 278 P.3d 1026.

## DISCUSSION

¶10 Montana law requires a trustee to "administer the trust according to the trust instrument[.]" Section 72-34-101, MCA. Here, the Trustee interpreted the Trust to require the distribution of $50,000 each to Homer and Karl upon the sale of the Property. The District Court agreed with the Trustee's interpretation. Maxine argues that the District Court's interpretation eviscerates the purpose of the Trust: to provide her with suitable housing. To fulfill that purpose, she argues the District Court should have ordered the Trustee to purchase her a new home with the proceeds from the sale of the Property. The Trustee counters that the District Court correctly interpreted the Trust's plain language, and that selling the Property was not inconsistent with providing for Maxine because the Trust has continued to support her.

¶11 The seven-page Trust Agreement is organized into ten Articles and a prefatory section. In the prefatory paragraphs, the Agreement explains that the Trust was created

5

for Maxine's benefit "subject to the express directives and purposes described hereunder." Article Two provides the Trust's purposes, which include the first directive regarding the sale of the residence:

> 1. The purposes of this trust are to provide for the health, welfare and care of the Beneficiary, according to the following priorities. The primary purpose of this trust is to provide suitable housing for the beneficiary so long as the Beneficiary can live in her home, and to manage the trust's financial resources for the long-term welfare of the Beneficiary. The Trustee shall effectuate the following trust purposes:
>
>    a. To take title to the Beneficiary's personal residence;
>
>    b. To use Trust funds to pay the existing mortgage so that there is no indebtedness on the residence;
>
>    c. To manage the real estate for the benefit of the beneficiary and use rental income from the residence and other trust assets to pay for maintenance, upkeep, regular bills and expenses of the property;
>
>    d. To take other actions that Trustee determines is in the Beneficiary's best interests, including the sale of the residence, and/or make other expenditures of trust property, principle [sic] or income, that in the Trustee's discretion is necessary for the health, care and welfare of the Beneficiary;
>
>    e. To make disbursements to Homer J. Steiner III and Karl Frederick Steiner up to the amount of $50,000 each, provided that the Beneficiary's housing and other basic needs are met[.]

Article Three provides that the sale of the residence is the event that triggers the distributions to Maxine's brothers, Homer and Karl:

> In the event that the residence is sold during the Beneficiary's lifetime, the Trustee shall promptly distribute a portion of the proceeds from the sale to Homer J. Steiner III and Karl Frederick Steiner or their respective lineal descendants, per stirpes, as set forth in Article Four Part 1 of this document.

Article Four Part 1 provides the directives to be followed upon the Beneficiary's death, including sale of the Trust property and distribution of $100,000 to Homer and Karl. Article Nine sets forth the procedure for modification of the Trust. Although the Trustee is permitted to amend the Trust if amendment is "necessary to effectuate the purposes of this Trust," it strictly prohibits any amendment that would eliminate the $50,000 distributions:

> This Trust is irrevocable. The Trust may be amended by the Trustee in the event that amendment is necessary to effectuate the purposes of this Trust, subject to the best interests of the Beneficiary. The Trust may not be amended so as to eliminate the requirement to make the payments to Homer J. Steiner III and Karl Frederick Steiner or their lineal descendents as set forth herein.

¶12 When interpreting a trust provision, this Court looks at the "entire trust agreement," rather than just "a particular word or phrase." *Bair Family Trust*, ¶ 32. We seek to interpret a trust's language such that every expression gains "some effect," rather than an interpretation that renders inoperative any of the expressions. *Bair Family Trust*, ¶ 32 (quoting *In re Estate of Snyder*, 2000 MT 113, ¶ 10, 299 Mont. 421, 2 P.3d 238). "When interpreting an instrument, we emphasize substance over form, and we construe the instrument's words in their ordinary and grammatical sense, absent a clear opposite intention." *Bair Family Trust*, ¶ 32.

¶13 In *Bair Family Trust*, ¶ 36, we held a trustee had a fiduciary duty to fulfill the "clear directives" of the trust agreement. There, the trustee and a board of advisors voted to permanently close the Charles M. Bair Family Museum in Martinsdale because of concerns about the museum's economic viability; its outdated heating-and-ventilation

7

system, which failed to keep the museum at the proper humidity level for a museum; the absence of a fire-sprinkler system; the distance of the museum from the nearest police or fire department; and the lack of a closed-circuit television security system. *Bair Family Trust*, ¶ 25. The trustee and board argued that their actions were consistent with the trust agreement because the "driving force" or "primary purpose" of the trust was general philanthropy, not the specific creation of a museum. *Bair Family Trust*, ¶ 31. The trustee and board supported this interpretation by pointing out that no mention of a museum was included in the "Purposes of the Trust" section of the trust. *Bair Family Trust*, ¶ 31. The State intervened, challenging the closing of the museum as a breach of the trustee's and board's duty to administer the trust agreement. *Bair Family Trust*, ¶¶ 24, 26. The District Court ruled that the creation of the museum was merely authorized in a "precatory clause," and therefore the trustee's decision to create the museum was "discretionary." *Bair Family Trust*, ¶ 30. On appeal, this Court reversed. We concluded that, contrary to the District Court's interpretation that creation of the museum was merely "precatory" language, a full reading of the trust showed a "clear directive" to create the museum:

> The District Court's determination that the Trust Agreement imposed no legal obligation on the Board to create the Museum would find some support if Alberta Bair only described her desire to establish the Museum as her "cherished aim and foremost desire." Section § 6.2(e) [of the Trust] however, does more than advise or attempt to influence the Board to create Alberta Bair's Museum; rather, her Trust Agreement provides a clear directive to the Board to create the Museum and provides the Board with direction and guidance on how to proceed.

8

*Bair Family Trust*, ¶ 36 (internal citation omitted). Ultimately, we concluded the trustee and board had breached their duty to the trust by not curing the shortcomings that prompted their decision to close the museum. *Bair Family Trust*, ¶ 60.

¶14 As in *Bair Family Trust*, ¶ 36, the Trust here does more than merely "advise or attempt to influence" the Trustee to make the $50,000 distributions. The Trust Agreement clearly directs that Homer and Karl are each to receive $50,000 upon the sale of the Property. Under Article Two the Trust states that the "Trustee *shall* effectuate the following trust purposes . . . . (e) To make disbursements to Homer J. Steiner III and Karl Frederick Steiner up to the amount of $50,000 each, provided that the Beneficiary's housing and other basic needs are met." (Emphasis added.) Article Three again directs that if the Property is sold during Maxine's lifetime, "the Trustee *shall* promptly distribute a portion of the proceeds from the sale to Homer J. Steiner III and Karl Frederick Steiner . . . ." (Emphasis added.) Finally, the Trust prohibits amendment of this directive: "The Trust may not be amended so as to eliminate the requirement to make the payments to Homer J. Steiner III and Karl Frederick Steiner . . . ."

¶15 While we agree with Maxine that, as the Trust Agreement states, the "primary purpose" of the Trust is to provide her with suitable housing, it is also clear that the Trust had a secondary purpose of making the designated distributions to Homer and Karl. While these distributions are to be made "provided that the Beneficiary's housing and other basic needs are met," the Trust has been able to provide suitable housing for Maxine since the sale of the Property and has promised to continue to do so as long as the

9

Trust can maintain funds. Maxine's interpretation of the Trust Agreement would render inoperative the provisions directing the Trustee to make the distributions. It is a well-settled rule of construction that we "seek to interpret a trust agreement's language such that every expression gains some effect, rather than an interpretation that renders inoperative any of the expressions." *Bair Family Trust*, ¶ 32. The triggering event for the distributions is the sale of the Property, at which point the distributions were to be made "promptly." The Trust strictly prohibits any amendment that would modify this obligation. If we were to adopt Maxine's interpretation and require the Trustee to use the entire sale proceeds to purchase a new house for Maxine, the provision for the prompt distribution to Homer and Karl upon sale of the Property would not be implemented.

¶16    Citing Article III of the Trust Agreement, Maxine argues that she was to be removed from the residence and the residence sold only "in consultation with the Beneficiary and in consultation with, and upon the advice of, appropriate health care and/or social workers." However, it is clear from the record that Maxine acknowledged that the sale of the Property was necessary. She stated that "at the request of the Trustee, *and because the property needed repairs for which there was little or no money to do them*, I agreed to let the house be sold. . . ." (Emphasis added.) Despite the efforts of Maxine's family, the Trust was without cash and something had to be done. Proceeding to sell the Property triggered the clearly stated provisions of the Trust Agreement to make the distributions to Homer and Karl.

10

¶17 We hold that the District Court correctly concluded that the Trust Agreement required the Trust to make the $50,000 distributions upon the sale of the Property. *Bair Family Trust*, ¶ 36.

¶18 Affirmed.

/S/ JIM RICE

We concur:

/S/ MICHAEL E WHEAT
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ BRIAN MORRIS