FILED

10/11/2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 16-0143

DA 16-0143

IN THE SUPREME COURT OF THE STATE OF MONTANA

2016 MT 253

IN THE MATTER OF THE ESTATE OF
JOHN S. McCLURE and the McCLURE TRUST dated
July, 19, 1993

GEORGE E. McCLURE, JOHN W. McCLURE
and VERLAYN G. McMANUS,

      Plaintiffs, Cross-Defendants,
      and Appellees,

    v.

RUTH ELSIE STILLER MILLER McCLURE,
individually and as Trustee of the JOHN S. McCLURE
and RUTH ELSIE STILLER MILLER McCLURE TRUST,

      Defendant, Cross-Complainant,
      and Appellant.

APPEAL FROM:    District Court of the Fifth Judicial District,
                In and For the County of Beaverhead, Cause No. DP 14-5323
                Honorable Loren Tucker, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

           William E. McCarthy, Jesse C. Kodadek, Worden Thane P.C., Missoula,
           Montana

      For Appellees:

           Mark A. Bryan, Bryan Law Offices, P.C., Bozeman, Montana

           Bruce M. Jacobs, Law Offices of Bruce M. Jacobs, Bozeman, Montana

                   Submitted on Briefs:  August 24, 2016
                            Decided:  October 11, 2016

Filed:

                                    Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Since John S. McClure's (Jack) death in January 2013, his widow, Ruth Elsie Stiller Miller McClure (Ellie), and his children, George E. McClure, John W. McClure, and Verlayn G. McManus (collectively Siblings), have been involved in contentious litigation regarding the McClure Family Trust (the Trust). Ellie sought to enforce an amendment to the Trust, but the Fifth Judicial District Court concluded that under the Trust's plain language Ellie has no interest in any Trust assets. The court also rejected Ellie's attempt to disinherit Siblings for purportedly contesting the Trust's validity.

¶2 We conclude that Ellie has an interest in Trust assets and that Siblings did not forfeit their interest in the Trust.

## PROCEDURAL AND FACTUAL BACKGROUND

¶3 In 1993, Jack and his wife Dixie—Siblings' mother—established the Trust by executing a standard form Revocable Living Trust Agreement (the Trust Agreement) that they obtained from an out-of-state company. Along with the Trust Agreement, the company provided Jack and Dixie with a binder that included various other documents relating to the Trust (Trust Binder). The Trust Agreement states that the Trust's primary purpose was to "provide for the health, support and maintenance of [Jack and Dixie] during their lifetimes." The Trust assets initially included real property in Montana and in Oregon, vehicles, and bank and investment accounts.

¶4 The Trust Agreement created a revocable trust that Jack and Dixie could modify or amend while both were living. The Trust Agreement provides that, upon the death of either Jack or Dixie, the living spouse "shall divide the entire Trust Estate into two or

2

more separate trusts to be known . . . as the 'Survivor's Trust' and the 'Decedent's Trust.'" The Trust Agreement makes clear that the Decedent's Trust is irrevocable, "but the Survivor's trust shall continue to be revocable and subject to amendment and modification by the surviving Trustor."

¶5 The Trust Agreement specifies that the principal of the Survivor's Trust "shall consist of all the interest in each and every asset held by the Trustee pursuant to this declaration on or by reason of the death of the deceased Trustor, not allocated to the principal or Trust Estate of the Decedent's Trust pursuant to Section 3.3." Section 3.3, in turn, stipulates that the principal of the Decedent's Trust "shall consist of assets equal in value to the maximum amount, if any, that can pass free of federal estate tax by reason of the unified credit available to the estate of the Trustor." The surviving spouse has an unlimited right to withdraw "as much of the principal of the Survivor's Trust as he or she shall request in writing." Conversely, the surviving spouse's right to withdraw funds from the principal of the Decedent's Trust is limited to the greater of $5,000 or five percent of the principal per year.

¶6 The Trust Agreement names Siblings as beneficiaries, with each receiving one-third of the Trust principal upon the surviving spouse's death. The Trust Agreement appoints John W. McClure or George McClure to serve as successor trustee upon the surviving spouse's death. The Trust Agreement contains a no contest provision that provides that any beneficiary who contests the Trust's validity shall forfeit any interest the beneficiary may have under the Trust.

¶7     Dixie died in 2004.  The Trust assets at that time were valued low enough to pass free of the federal estate tax by reason of the unified tax credit.  Following Dixie's death, Jack continued to accumulate assets, which became part of the Trust principal.  Jack also continued to treat the entire Trust as revocable and he did not divide the Trust assets between a Survivor's Trust and a Decedent's Trust.

¶8     Jack married Ellie in 2006.  Prior to marrying, Jack granted Ellie a life estate in their marital home in Dillon, Montana.  The home is a Trust asset.  In September 2012, Jack executed the First Amendment to the Trust (Amendment), which purported to make Ellie his successor trustee.  The Amendment specified that upon Jack's death, Ellie would "become the sole beneficiary <u>for her lifetime</u> of all income and principal of the [Trust].  Such income and principal shall be available to her at her discretion to maintain her comfort, care and general welfare and living expenses, including medical expenses." (Emphasis in original.)  The Amendment specified further that upon Ellie's death, "all remaining assets of the [Trust] shall be distributed according to the terms of said trust" to Siblings.  Finally, the Amendment named George McClure trustee upon Ellie's "resignation, death or incapacity."

¶9     Jack died four months after executing the Amendment.  Jack's will, which was included in the Trust Binder, contained a pour-over clause that conveyed all of his property to the Trust to be "held, administered, and distributed in accordance with its provisions, including any amendments made to it before [his] death."  Jack's will also contained a no contest provision similar to that of the Trust Agreement.

¶10    In June 2014, Siblings sued Ellie for conversion of Trust assets, unjust enrichment, and breach of fiduciary duty.  Siblings sought compensatory and punitive damages. Siblings requested also that the court set aside both the Amendment and the life estate Jack conveyed to Ellie in their home.  Ellie counterclaimed, seeking a declaratory judgment concerning the construction, validity, and application of the Trust Agreement, the Amendment, and the life estate.  In September 2014, unbeknownst to Ellie, George opened a probate action and petitioned to become the personal representative of Jack's estate, which the District Court granted.  Upon learning of this development, Ellie petitioned to have George removed as personal representative of Jack's estate.

¶11    The parties filed cross-motions for summary judgment in the civil case regarding the construction of the Trust Agreement, the manner in which the trusts should have been funded, and the Amendment's validity.  The District Court issued an order consolidating the civil and probate cases, denying Ellie's summary judgment motion, and denying her petition to remove George as personal representative.  The court concluded that under the Trust Agreement's plain language, the Decedent's Trust should have been funded up to the amount that could pass free of federal estate tax under the unified credit, which was $1.5 million at the time of Dixie's death.  Because the Trust's assets were "substantially less than this amount," the District Court concluded that "the Survivor's Trust never came into existence."  Accordingly, the court determined that the Amendment was invalid.

¶12    Ellie appealed the District Court's order.  Before submitting an opening brief on appeal, Ellie filed a motion to stay the appeal and remand to the District Court so the

5

court could consider the "Trustee Instructions," which were included in the Trust Binder. Ellie asserted that Siblings kept the Trustee Instructions from her. She alleged that the instructions showed that the District Court erroneously interpreted the Trust. Siblings opposed Ellie's motion and filed a motion to dismiss her appeal. We dismissed the appeal without prejudice. *George E. McClure v. Ruth Elsie Stiller Miller McClure*, No. DA 15-0311, Or. (Mont., Sept. 08, 2015).

¶13 Upon remand, Ellie filed several motions. She sought to revise the court's previous order to conclude that the Survivor's Trust came into existence based on the Trustee Instructions; she moved for partial summary judgment declaring that the Decedent's Trust became fixed in value upon Dixie's death in 2004; and she asked the court to forfeit Siblings' interests under the no contest provisions of the Trust and Jack's will. The District Court denied the motions, reasoning that: the Trust Agreement was unambiguous and therefore the court did not need to consider the Trustee Instructions, which it concluded were extrinsic evidence; Jack did not create a separate trust with the assets he accumulated following Dixie's death, and therefore those assets were part of the Decedent's Trust; and, even if the no contest provisions applied, they would be unenforceable against Siblings. Ellie appeals both the District Court's initial order interpreting the Trust Agreement and its order denying her motions upon remand.

**STANDARDS OF REVIEW**

¶14 We review summary judgment rulings de novo. *Garza v. Forquest Ventures, Inc.*, 2015 MT 284, ¶ 11, 381 Mont. 189, 358 P.3d 189. Summary judgment is appropriate when the moving party demonstrates the absence of a genuine issue of material fact and

6

entitlement to judgment as a matter of law. M. R. Civ. P. 56(c)(3); *Garza*, ¶ 11. A district court's interpretation of a trust agreement presents a question of law, which we review for correctness. *In re Charles M. Bair Family Trust*, 2008 MT 144, ¶ 32, 343 Mont. 138, 183 P.3d 61 (hereafter *Bair Family Trust*). Similarly, whether a portion of a written agreement is ambiguous is a question of law, which we review for correctness. *In re Marriage of Holloway*, 2000 MT 104, ¶ 5, 299 Mont. 291, 999 P.2d 980.

## DISCUSSION

¶15    As an initial matter, we are unpersuaded by Siblings' contention that Ellie's appeal is improper. As Ellie correctly argues, the District Court's orders are orders "refusing, allowing, or directing the distribution of any estate or part thereof" under M. R. App. P. 6(4)(e). The District Court's rulings deny Ellie any interest in or claim to Jack's estate. As such, the orders "are considered final," M. R. App. P. 6(4), and we may review them on appeal, M. R. App. P. 6(1).

¶16    *1. Whether the District Court erred in interpreting the Trust Agreement.*

¶17    The District Court concluded that the Trust Agreement's terms are unambiguous. The court noted that under Section 3.2 of the Trust Agreement, the principal of the Survivor's Trust consists of only those assets not allocated to the principal of the Decedent's Trust. The court relied on the directive in Section 3.3 that the principal of the Decedent's Trust "shall consist of assets equal in value to the maximum amount, if any, that can pass free of federal estate tax by reason of the unified credit." The court determined that, because the unified credit amount was $1.5 million when Dixie died, "the Decedent's Trust should have been funded up to that amount." Because the Trust

7

assets did not exceed $1.5 million when Dixie died, the court determined that "the Survivor's Trust could not have been funded at all." Accordingly, it concluded "that the Survivor's Trust never came into existence."

¶18 Addressing Section 3.1 of the Trust Agreement, which provides that the trustee "shall divide the entire Trust Estate into" a Survivor's Trust and a Decedent's Trust, the court stated:

> Section 3.1 simply requires the trustee to divide the trust according to the provisions set out in Sections 3.2 and 3.3. When these three provisions are read together, it becomes clear that the word "shall" [in Section 3.1] only clarifies that the trustee has no discretion to refuse to fund the Survivor's Trust with all funds not allocated to the Decedent's Trust. Under the plain language of Section 3.3, the Survivor's Trust is not funded when assets do not exceed the value of the unified credit.

The District Court concluded further that "Section 3.1 only generally provides for division of the estate into two trusts," whereas "Sections 3.2 and 3.3 specifically provide how this division must occur."

¶19 The court acknowledged that at the time Jack and Dixie created the Trust, "the unified credit was only $600,000." The court also determined that Jack and Dixie may have anticipated that assets "would be left over to transfer into the Survivor's Trust" after the Decedent's Trust had been funded up to the maximum amount allowed by the unified credit. The court concluded, though, that the Trust Agreement "plainly demonstrates that [Jack and Dixie] intended the amount to vary with the unified credit." So, the court decided, the plain language of Section 3.3 "demonstrates that the primary purpose was to avoid estate taxes, not to fund the Survivor's Trust."

8

¶20 Because the court found no ambiguity in the Trust Agreement, it declined to consider documents from the Trust Binder because they were extrinsic evidence. Based on its determination that the irrevocable Decedent's Trust came into existence, but that the revocable Survivor's Trust did not, the court concluded that Jack had no power to amend the Trust Agreement. Consequently, the court determined that "the purported Amendment [was] invalid" and that Ellie had no right to Trust assets. While the court did not speak directly to the issue, its holding that the irrevocable Decedent's Trust included all the Trust assets necessarily means that Jack did not have authority to convey the life estate to Ellie.[1]

¶21 Unquestionably, "[t]he trustor's intent controls our interpretation of a trust agreement." *Bair Family Trust*, ¶ 32 (citing *In re Estate of Snyder*, 2000 MT 113, ¶ 10, 299 Mont. 421, 2 P.3d 238; *Matter of Estate of Bolinger*, 284 Mont. 114, 120, 943 P.2d 981, 985 (1997)). To discern intent, we look to "the language of the entire trust agreement, rather than [to] a particular word or phrase." *Bair Family Trust*, ¶ 32 (citing *Estate of Snyder*, ¶ 10; *Estate of Bolinger*, 284 Mont. at 120, 943 P.2d at 985). Thus, we seek to "give some effect to every expression" in interpreting a trust agreement's language; we avoid "an interpretation which will render any of the expressions inoperative." *Estate of Snyder*, ¶ 10 (quoting *Estate of Bolinger*, 284 Mont. at 121, 943 P.2d at 985). Further, "we emphasize substance over form, and we construe the [trust

---

[1] The District Court did address the life estate in its second order, concluding that Siblings should be allowed to engage in additional discovery regarding whether Ellie had actual knowledge that Jack did not have authority to grant a life estate in the property.

agreement's] words in their ordinary and grammatical sense, absent a clear opposite intention." *Bair Family Trust*, ¶ 32 (citation and internal quotations omitted).

¶22    By focusing on a particular section of the Trust Agreement—Section 3.3—the District Court failed to analyze "the language of the entire [T]rust [A]greement" to discern Jack's and Dixie's intent in creating the Trust. *Bair Family Trust*, ¶ 32. Section 1.1 of the Trust Agreement unequivocally manifests Jack's and Dixie's intention that the Trust's primary purpose "shall be to provide for the health, support and maintenance of [Jack and Dixie] during their lifetimes, in their accustomed manner of living." The Trust's expressed secondary purpose, on the other hand, "shall be to permit [Jack and Dixie] to provide funds for the reasonable health, support, and education of" Siblings. By concluding—based on its narrow emphasis on Section 3.3—that Jack's and Dixie's "primary purpose was to avoid estate taxes, not to fund the Survivor's Trust," the court elevated the Trust Agreement's stated secondary purpose—to provide for Siblings—over the express primary purpose—to provide for Jack upon Dixie's death. And the court failed to give "some effect to every expression" in the Trust Agreement when it relied exclusively on Section 3.3. *Estate of Snyder*, ¶ 10.

¶23    Likewise, the District Court's interpretation rendered additional sections of the Trust Agreement inoperative. Section 3.1 provides that the trustee "shall divide the entire Trust Estate into" a Survivor's Trust and a Decedent's Trust, and Section 1.7 states that upon the first spouse's death, "the Decedent's Trust . . . shall become irrevocable but the Survivor's Trust shall continue to be revocable and subject to amendment and modification by the surviving trustor." These sections, construed "in their ordinary and

10

grammatical sense," *Bair Family Trust*, ¶ 32, required that the Trust be divided into a revocable Survivor's Trust and an irrevocable Decedent's Trust upon Dixie's death so that Jack would have the ability to manage his survivor's share for his support during the remainder of his lifetime. Contrary to the District Court's determination, the Trust Agreement's other provisions do not establish a "clear opposite intention." *Bair Family Trust*, ¶ 32.

¶24 Nevertheless, as the District Court concluded, Section 3.3 could be interpreted reasonably to require that the Decedent's Trust be funded up to the maximum amount of the unified tax credit. Such an interpretation would result in no assets being allocated to the Survivor's Trust, because Section 3.2 limits the principal of the Survivor's Trust to those assets "not allocated to the principal . . . of the Decedent's Trust." This interpretation, however, conflicts with both the plain language of Sections 1.7 and 3.1 and the stated intent of Jack and Dixie in creating the Trust. The Trust Agreement's terms are thus susceptible to more than one reasonable interpretation. Consequently, the Trust Agreement is ambiguous. Because the Trust Agreement is ambiguous, "extrinsic evidence is admissible to aid in determining the . . . meaning of the terms and [Jack's and Dixie's] intent in distributing their property through the Trust." *In the Matter of the Estate of the Dern Family Trust*, 279 Mont. 138, 145, 928 P.2d 123, 127-28 (1996) (hereafter *Dern Family Trust*). Extrinsic evidence includes documents associated with a trust agreement, such as trustee instructions. *Dern Family Trust*, 279 Mont. at 147-48, 928 P.2d at 129.

¶25    The Trust Binder includes both the Trustee Instructions and a "Trust Summary." The Trust Summary "identifies the documents [the company] prepared in accordance with the instructions and preferences [Jack and Dixie] stated in [their] application." Summarizing "some of the key provisions" of the Trust Agreement, it specifies:

> Section 3.2 provides that the trust estate will split into two equal trusts, with the decedent's (or "B") trust becoming irrevocable.
>
> Section 3.3 provides that the surviving spouse will have full authority and control over the survivor's (or "A") trust and is entitled to:
>
> > (1) all income from the assets of the "B" trust;
> > (2) access to the principal of the "B" trust under certain conditions;
> > (3) withdraw up to $5,000 or 5% from principal each year for any purpose.[2]

The Trust Summary identifies the other documents in the Trust Binder. It states that the Trustee Instructions "provide[ ] your surviving spouse, and/or another successor trustee with guidelines and forms for settling the trust affairs when either of you dies."

¶26    The Trustee Instructions, in turn, provide, "If a couple have a complex (federal tax planning) A-B Trust, one-half of the Trust (the Decedent's B Trust) may become irrevocable upon the death of a spouse." The Trustee Instructions continue:

> The decedent's share of community and separate property should be identified and placed in the Decedent's B Trust, with any excess over $600,000 placed in the "C" Trust, if available.
>
> The decedent's assets consist of the decedent's separate property and the value of the decedent's share of the community or common property. One-half of the asset value of the community or common property must flow into Trust B . . . . This does not mean that both the decedent's and the survivor's trust need to own half of all assets at death. You may place total

---

[2]  The Trust sections identified in the Summary are not entirely accurate or complete.

12

ownership of any asset in either trust as long as you put an equal value of assets into the "A" and the "B" (plus "C") trusts.[3]

The Trustee Instructions make clear that "[a] person who has an 'A-B' Trust with federal tax planning features . . . must allocate assets among the applicable trusts."

¶27 Reading the Trust Agreement together with the Trust Summary and the Trustee Instructions "so as to give effect to all," the documents show that Jack and Dixie intended for the Survivor's Trust to be funded. *Dern Family Trust*, 279 Mont. at 148, 928 P.2d at 129. Because Jack's and Dixie's "intent controls our interpretation of [the] [T]rust [A]greement," we hold that the District Court incorrectly interpreted the Trust Agreement. *Bair Family Trust*, ¶ 32.

¶28 Under the Trust Agreement, the Survivor's Trust—which is "subject to amendment and modification by" Jack—should have come into existence and been funded. Accordingly, we conclude that the District Court incorrectly determined that the Amendment is invalid. *See* § 72-38-602(1), MCA ("Unless the terms of a trust expressly provide that the trust is irrevocable, the settlor may . . . amend the trust."); § 72-38-602(3), MCA ("The settlor may . . . amend a revocable trust: (a) by substantial compliance with a method provided in the terms of the trust; or (b) if the terms of the trust do not provide a method, by a writing delivered to the trustee manifesting clear and convincing evidence of the settlor's intent.").

---

[3] There is no "C" trust under the Trust Agreement; just a Survivor's Trust ("A" trust) and Decedent's Trust ("B" trust).

¶29    Finally, Section 1.5 of the Trust Agreement provides:

> All property now or hereafter conveyed or transferred to the Trustee(s) pursuant to this Declaration, which was . . . separate property at the time of such conveyance or transfer, shall retain its character [as] . . . the separate property of the Trustor transferring such property to the Trust, during Trustors' lifetimes.

Section 1.5 provides plainly that the assets Jack accumulated after Dixie's death are considered Jack's separate property. Pursuant to the Trustee Instructions, those assets cannot be included in the Decedent's Trust because they cannot comprise Dixie's separate property, nor can they comprise Dixie's share of the community or common property. Consequently, Jack's assets accumulated after Dixie's death are part of the Survivor's Trust and are subject to the Amendment. *See* § 72-38-602(2), MCA ("If a revocable trust is created or funded by more than one settlor . . . each settlor may . . . amend the trust with regard the portion of the trust property attributable to that settlor's contribution.").

¶30    Upon remand, the District Court must calculate the Trust assets at the time of Dixie's death, and it must divide the value of those assets equally between the Decedent's Trust and the Survivor's Trust. The court also must calculate the value of the assets Jack accrued after Dixie's death and apportion them to the Survivor's Trust. Additionally, in light of our conclusion that the revocable Survivor's Trust—which Jack had the authority to amend—came into existence, the District Court must revisit its consideration of the life estate that Jack conveyed to Ellie in their marital home.

14

¶31    *2. Whether the District Court incorrectly determined that Siblings did not forfeit their interests in the Trust pursuant to the no contest provisions of the Trust Agreement and Jack's will.*

¶32    The Trust Agreement's no contest provision provides that

> if any beneficiary hereunder asserts any claim (except a legally enforceable debt), statutory election, or other right or interest against or in Trustor's estate, Trustor's Will, or any properties of this trust, other than pursuant to the express terms hereof or of said Will, or directly or indirectly contests, disputes, or calls into question, before any court, the validity of this instrument or of said Will, then . . . [that person] shall thereby absolutely forfeit any and all beneficial interests of whatsoever kind and nature which such beneficiary might otherwise have under this instrument.

The no contest provision of Jack's will in like fashion provides that if any beneficiary of Jack's estate "seeks through any court proceeding to prevent the admission to probate or to contest the validity of this Will or any of its provisions, any share or interest in [Jack's] estate given to that beneficiary under this will is hereby revoked."

¶33    The District Court concluded that the no contest provisions did not proscribe Siblings' actions. It determined that in the probate proceeding, "George sought to admit [Jack's] Will to probate and to force Ellie to account for her conduct as purported trustee." In the civil proceeding, the court determined that Siblings "sought damages from Ellie for conversion of trust assets and breach of fiduciary duties while she acted as trustee." Based on its analysis of the two proceedings, the court concluded that Siblings "never attacked the Trust Agreement." Furthermore, the court concluded, Siblings' "actions do not 'contest' or 'dispute' the trust's validity or assert an interest other than the one conveyed by the terms of the Trust." Accordingly, the District Court held that the plain language of the Trust Agreement's no contest provision "does not apply to such

conduct." The District Court concluded similarly that the no contest provision of Jack's will did not apply to Siblings' conduct.

¶34 We agree with the District Court. A review of Siblings' complaint in the civil proceeding and George's petition in the probate proceeding establishes that they—similar to Ellie—simply were trying to ascertain the meaning of the Trust's language. Our conclusion that the Trust Agreement is ambiguous establishes further that Siblings acted within reason in trying to determine the Trust's construction. Accordingly, we conclude that the District Court correctly determined that Siblings did not forfeit their interests in the Trust.

## CONCLUSION

¶35 We reverse the District Court's holding that the Amendment was invalid and remand for further proceedings consistent with this Opinion. We affirm the District Court's conclusion that Siblings did not forfeit their interest in the Trust.

/S/ BETH BAKER

We Concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT
/S/ JAMES JEREMIAH SHEA